# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GARRINA BYRD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:06-cv-00522 (RCL) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

This dispute originates from allegations of sexual harassment by former female employees of the District of Columbia Department of Parks and Recreation ("DPR") against their male supervisors.  Plaintiffs Garrina Byrd, Demera Gaskins, Annette Burns, and Carmen Jean-Baptiste bring this suit against the District of Columbia seeking damages for unlawful sexual harassment and discrimination that each suffered during the course of their employment. Plaintiffs allege several violations of numerous provisions of Title VII of the Civil Rights act of 1964, the D.C. Human Rights Act, the D.C. Whistleblowers Protection Act, and the First and Fifth Amendment of the United States Constitution under 42 U.S.C. § 1983.

The severity of grievances ranges from complaints of inappropriate sexual comments to accusations of unwanted touching and fondling to allegations of the most serious kind—pervasive sexual assault.  The factual narratives not only involve descriptions of abhorrent individual victimization but also collectively illustrate insidious systematic problems within DPR's administrative body.  Despite DPR's outwardly altruistic participation in welfare-to-work

programs, plaintiffs allege that DPR's pattern of intentional neglect in providing adequate training and supervision and its willful refusal to aid disadvantaged employees evince its ongoing participation in systematic discrimination. Plaintiffs complain that gross mismanagement within DPR's administration has significantly contributed to their injuries. They furthermore point to the lack of remedial options available to mitigate the harassment they have suffered. A review of the background of the case, the governing law, the parties' arguments, and the Court's reasoning in resolving any disputes is set forth below.

## II.    BACKGROUND

Because of the sheer volume of detail required in a case involving four individual plaintiffs and several multi-component counts, the parties have submitted extensive evidence in support of their arguments. The Court sets forth below only those facts and details from the procedural history necessary to resolve the arguments that follow.

### A.    Factual History

All four plaintiff-employees occupied different positions at DPR for varying durations between 2000 and 2006. During this time, DPR routinely classified its employees' employment statuses as temporary, seasonal, or term appointments as opposed to permanent positions. Pls.' Mot. Partial Summ. J., ECF No. 121-3, Ex. 5, at 106–12 ["Marshall Dep."]. Generally, seasonal employees were hired for the summer months; temporary employees were hired for set periods outside specific seasons; and term employees were hired for thirteen-month periods. *Id.* Only term employees were union members of the American Federation of Government Employees, Local 2741 for the Department of Parks and Recreations ("AFGE Local 2741"). *Id.* An employee's manager could request the renewal of non-seasonal employment, which would be granted automatically provided that the director or associate director did not reject the request.

*Id.*; Pls.' Mot. Partial Summ. J., ECF No. 121-8, Ex 6, at 52–53 ["Khabo Dep."].  DPR's high-level management personnel transitioned several times during this period; consequently this case involves a shifting cast of individuals responsible for DPR's administration.[1]

Project Arise—later known as Project Empowerment—was a D.C. Department of Employment Services' welfare-to-work program responsible for the initial hire of many of DPR's employees.  Pls.' Mot. Partial Summ. J., ECF No. 121-3, Ex 1, at 34–35 ["Burns' Dep."].  Program participants worked for DPR as a condition of their continued receipt of governmental assistance, and after a successful probationary period were hired directly by DPR.  A primary goal of the program was to promote economic self-sufficiency by transitioning economically disadvantaged D.C. residents from subsidized incomes to independent employment.

### 1. Darnell Thompson

Darnell Thompson was the Chief of DPR's Maintenance Division.[2]  In this capacity, he supervised the general administration of the Division.  He was solely responsible for requesting the renewal of subordinate, term and temporary Maintenance Division employees, and possessed the authority to fire and hire employees provided that he afforded them "due process."  Marshall Dep., [121-3] at 106–12; Khabo Dep., [121-18] at 52–53.  His principal office was at DPR's Half Street location, but he occasionally traveled among recreation centers under his supervision.

### a. Allegations of Sexual Harassment

### i. Annette Burns

Originally retained through Project Arise, DPR hired Burns directly in 2001 to work as a clerical assistant in the Maintenance Department at its Half Street location.  Burns' Dep., [121-

---

[1] According to the parties' briefing, Neil Albert was DPR's Department Director from 2001 through 2004. Neil Stanley, DPR's General Counsel from 2002 to 2005, served as Interim Department Director from 2004 through June 2005.  Neil Rodgers, formerly DPR Chief of Staff, served as Department Director through 2006 and Roslyn Johnson was named Department Director in June 2006.

[2] Thompson is also referred to as the Maintenance Director and the Facilities and Maintenance Manager.

3], at 43–45. She was appointed as a thirteen-month term employee under the day-to-day direction of clerical assistant, Joyce Roberts. Chief Thompson directly supervised both. *Id.*; Pls.' Mot. Partial Summ. J., ECF No. 121-10, Ex. 8, at 12–13 ["Roberts' Dep."]. While Thompson denies ever acting inappropriately toward Burns or having any sexual contact with her, Burns alleges a series of progressively inappropriate behavior by Thompson, culminating in physical assault. Pls.' Mot. Partial Summ. J., ECF No. 121-16, Ex. 14 ["Thompson Lerner Transcript"]; Burns' Dep., [121-3], at 86–90. In late 2001, Thompson's behavior, which Burns had previously perceived as father-like affection, began to turn too intimate. Burns' Dep., [121-3], at 86–90. She alleges that his physical contact, including hugs and shoulder rubs, progressively became more frequent, causing her great discomfort. *Id.* Burns claims to have repeatedly informed him that the behavior was unwelcome. *Id.* She also claims that she reported an incident where Thompson kissed her on the cheek to DPR supervisor James Boone, and she testified that Boone apologized and said that "it had been an ongoing thing with Mr. Thompson. . . . [a]nd he [Boone] would talk to him [Thompson]." *Id.* at 92:17–20.

After a disciplinary meeting in Thompson's office in April 2002, when she was eight months pregnant, Burns alleges Thompson grabbed her breast and tried to put his tongue in her mouth. *Id.* at 96:10–12. Burns attempted to fight him off, but in the course of the struggle, he used his body weight to lean on top of her and pushed down on her pregnant stomach for several minutes. *Id.* at 96:15–18. On May 1, 2002, Burns informed a doctor at the Washington Hospital Center that her supervisor forced himself upon her the previous day. Pls.' Mot. Partial Summ. J., ECF No. 121-18, Ex. 12 ["Burns Medical Records"]. She then contacted James Boone, who suggested she contact the "Union." Burns' Dep., [121-3], at 100, 103. Upon inquiring at DPR headquarters, Burns recalls narrating her version of Thompson's attack to receptionist, Margie

Clark, and asking how to register a complaint of sexual harassment against her supervisor. *Id.* Shortly thereafter, Burns claims that Deputy Director Khabo contacted her and told her he would file a complaint on her behalf, which Khabo neither confirms nor denies. *Id.* at 105; *see* Khabo Dep. [121-18].

For several of the following months, Burns was out on paid administrative leave per DPR's request. Burns' Dep., [121-3], at 105−06. She says she spoke with Director Albert to make arrangements for leave and he "ensured [her] that an investigation was going to take place." *Id.* at 106:4−5, 120:7−10. Returning to DPR in the summer of 2002, she worked at the Randell and Watkins Recreation Center. *Id.* at 110:10−11. She had no further contact with Thompson; she suspected, however, that she remained under his supervision because she was still an employee within the Maintenance Department, of which Thompson was still the Director.[3] *Id.* at 118:1−17. Thompson admitted that Director Albert told him about Burns' allegations of sexual harassment. Thompson Lerner Transcript, [121-16] at 35:14−19. DPR Chief of Staff Neil Rodgers and DPR EEOC Counselor Terrance Reddick spoke with Burns regarding her allegations.[4] Burns reported the harassment to Sylvia Gwathmey, the Union Steward of the AFGE Local 2741. Pls.' Mot. Partial Summ. J., ECF No. 121-11, Ex. 9, at 15 ["Gwathmey Dep."]. Additionally, Burns relayed her allegations to Project Arise employee Leslie Greene. Pls.' Mot. Partial Summ. J., ECF No. 121-18, Ex. 16 ["Greene Dep."]. Green testified that she told Burns to take her complaint to a different office because she was no longer a Project Arise employee. *Id.* DPR allegedly informed Burns that it found no merit to her

---

[3] Neither party can identify specific evidence at least detailing Burns' transfer, or whether she was transferred only to another location or to another department. It is clear to the Court, however, that Burns was no longer working at the Half Street location after April 2002.

[4] The District disputes Burns' assertions here claiming that she did not file an "official complaint." Even if that were true, however, it does not necessarily imply that these conversations did not actually happen or that DPR management was not aware of her claims.

complaint, however, she was neither aware of any investigation into her complaint, nor was she contacted again by anyone from DPR regarding her allegations. Burns' Dep., [121-3], at 120–21. Burns concluded that DPR did not take her complaint seriously. *Id.* at 121:20–21.

Burns' final term that was set on December 3, 2003, expired on January 19, 2004—over a year and half after the incident in Thompson's office. Pls.' Opp'n DMSJ, ECF No. 133-1, Ex. 31 ["Burns Personnel Documents"]. Despite DPR's unsupported assertions to the contrary, Burns claims that she never received any sexual harassment training, was never informed of DPR's sexual harassment policies, and was not told what to do if she was sexually harassed. Pls.' Opp'n DMSJ, ECF No. 132-18, Ex. 21, at ¶ 12 ["Burns Decl."]. She does not remember seeing any posted notices of her federal or local rights regarding workplace discrimination laws. *Id.* at ¶ 10.

### ii.    Demera Gaskins

Gaskins, whom DPR also hired through Project Empowerment as a summer employee, became a term, or "probationary," employee in October 2004. Pls.' Mot. Partial Summ. J., ECF No. 121-19, Ex. 17, at 29–37 ["Gaskins Dep."]. Under the authority of the Maintenance Division, Gaskins' responsibilities included cleaning different recreation centers and the Half Street location. *Id.* at 42–45, 76–77. She alleges that between July 2004 and March 2005, Chief Thompson visited her assigned recreation centers and physically assaulted her by trying to force her to perform sexual acts. *Id.* at 63–65. When she refused, she claims that he said her "job was on the line." *Id.* at 66–67. Her allegations against Thompsons also include: kissing and touching her breasts and buttocks at the Half Street location, pulling her into a closet to sexually assault her, calling her after hours on her cell phone, and video-recording images of Gaskins and other female workers' buttocks as they cleaned. *Id.* at 60–61, 78, 121–22. Thompson denies ever

having any sexual contact with Gaskins.  Thompson Lerner Transcript, [121-16] at 45−46.

Gaskins told her "Crew Leader," James Gripper, and her "Work Leader," Johnnie Richardson, about Thompson's harassment, but they instructed her not to tell anyone or let Thompson know she had been talking about it.  Pls.' Mot. Partial Summ. J., ECF No. 121-13, Ex. 11, at 313−16 ["Gripper Lerner Transcript"]; Gaskins Dep., [121-19] at 67, 73.  There is nothing in the record to suggest either Gripper or Richardson further reported or followed up on Gaskins' complaints.

Purportedly out of fear of losing her job, Gaskins made no further complaints to DPR management during her employment. Gaskins Dep., [121-19] at 73, 68−69, 81.  Gaskins' employment was prematurely terminated in March 2005. Pls.' Mot. Partial Summ. J., ECF No. 121-20, Ex. 18 ["Gaskins Personnel File"].  Thompson informed her she had been fired for tardiness and failure to keep the Emory Recreation Center clean. Gaskins Dep., [121-19] at 70−71.  Within a week of her termination, Gaskins called Director Stanley, who instructed her to get a lawyer if she had complaints against Thompson. *See* Gaskins Dep. [121-19] at 74:12−20 ("After I was fired I had talked to him to ask him about, questions how I can put out sexual harassment and he said on who and I told him and []he says for me to go get a lawyer.").

Gaskins does not recall seeing any posters regarding federal employment laws or receiving any specific sexual harassment training.  She did receive a one-page handout on the subject in October 2004, but cannot remember its contents.  Gaskins Dep., [121-19] at 30−31, 89−92.

### iii.    Garrina Byrd

Byrd was stationed as a maintenance worker and assigned to clean DPR recreation centers through her Project Empowerment placement.  Pls.' Mot. Partial Summ. J., ECF No. 121-24, Ex. 22, at 31−40 ["Byrd Dep."].  After transitioning to direct DPR employee status in

the summer of 2002, she and another female employee, Katrina Williams, were involved in an altercation with a third party over a non-work related matter. *Id.* at 45–50. Thompson directed them to report to his office the next day. *Id.* Although Thompson denies any impropriety, Byrd claims he demanded she expose her breasts or lose her job. *Id.* at 52–55. After she complied, Thompson assigned her to work at the Half Street office. *Id.* Thompson Lerner Transcript, [121-16] at 8–9. She began working as a clerical assistant under Joyce Roberts' direction. Roberts Dep., [121-10] at 12–13. On her first day, after rebuffing Thompson's attempts to violently grope her breasts, Byrd alleges that Thompson told her that, "in the morning I want titties and coffee." Byrd Dep., [121-55] at 75. According to Byrd, daily interactions with Thompson meant a stream of constant sexual comments, continual touching of her breasts and under her skirt, and repeated requests for sex and oral sex. *Id.* at 76–81. She claims she finally acquiesced to his demands out of fear that he would act on his threats and terminate her. *Id.* Byrd characterized Thompson's behavior as "rape without force." *Id.* She claims he ignored her protests and instead would "physically stand up and start pulling [her] clothes down." *Id.* at 82–85, 161–62. She estimates that Thompson forced her to have sex approximately seven times and oral sex two to three times under threat of termination. *Id.* at 87–91, 161–63. Thompson denies any sexual contact with Byrd. Thompson Lerner Transcript, [121-16] at 19–22.

Thompson allegedly refused to give Byrd work assignments, forcing her to sit in his office all day so that she was at his beck and call. Byrd Dep., [121-55] at 102. Byrd explains that Thompson became progressively more controlling and began calling her cell phone at night after telling her at work: "If you don't answer the phone for me tonight, don't come in here tomorrow." *Id.*; Pls.' Mot. Partial Summ. J., ECF No. 121-26, Ex. 24, at 272 ["Byrd Lerner Transcript"]. Friend and co-worker Marlo Chaney, who witnessed and occasionally answered

several of Thompson's late night calls, began to notice a sharp personality change in Byrd. Pls.'
Mot. Partial Summ. J., ECF No. 121-27, Ex. 25, at 15:14−22 ["Chaney Lerner Transcript"].

Chaney says Byrd became despondent and would call from her work, "upset and crying," and

"would be disgusted . . . her whole rapport, her whole frame of mind just completely changed . . .

she was just always upset." *Id.* Chaney heard Thompson threaten to fire Byrd and call her

"bitch."[5] *Id.* at 17:1−6. Another DPR employee, Tonya Kemper, witnessed Thompson make

sexually suggestive comments to Byrd and hit her buttocks on several occasions despite Byrd's

protests.[6] Pls.' Mot. Partial Summ. J., ECF No. 121-12, Ex. 10, at 71, 74−75 ["Kemper Dep."].

Julie Banks, Maintenance Supervisor for the Half Street location, also witnessed Thompson

yelling at Byrd.[7] Pls.' Mot. Partial Summ. J., ECF No. 121-6, Ex. 4, at 27−29 ["Banks Dep."].

Verified by Thompson's later admission, Banks witnessed him say to a pregnant Byrd—who was

unsure whether her baby was fathered by Thompson or her boyfriend—"[i]f you are pregnant,

we can take care of that right here. Just get a coat hanger and get on the desk." Banks Dep., [121-

6] at 26; Thompson Lerner Transcript, [121-16] at 23:15−18. Byrd testified that Thompson's

---

[5] Although she never filed any formal or informal complaints, Chaney stated in her Lerner interview that when she applied for her job with DPR, Thompson asked her if she was willing to have sex with him for a job. Chaney Lerner Transcript, [121-28] at 7−8. She agreed to have sex with him that day in his office. *Id.* at 8:18−19. She believes she would not have been hired by DPR if she had refused to have sex with him. *Id.* at 17:7−18.

[6] Kemper, employed by DPR from 2002 to 2003, was another 13-month term employee supervised by Thompson. Kemper Dep., [121-10] at 9−18. She claims that Thompson tried to grab her breast and buttocks even though she told him to stop. *Id.* at 36−38, 70, 86. Kemper states that in August 2003, "he actually grabbed on me and put his tongue in my mouth and said to me that if I don't have sexual intercourse with him, I won't have a job, at that point, that's when I called the director." *Id.* at 33:14−18. She immediately called Director Albert who told her to "calm down . . . [d]on't talk to nobody . . . [j]ust come up here." At DPR headquarters, she explained the series of events to Albert and Stanley. *Id.* at 49:18−22. She was transferred to another location and shortly thereafter her term was not renewed. *Id.* at 52, 55. Despite Albert's reassurances that DPR would undertake an investigation, she was never contacted again regarding her complaints. *Id.* at 53−55. Kemper claims she had not previously reported Thompson's inappropriate behavior because she did not receive any sexual harassment training until she was rehired by DPR in 2005. *Id.* at 41. Upon her rehire, in a conversation with Associate Director Saundra Ratliff, Kemper was under the "impression" that she must abandon her complaints of harassment to get her job back. *Id.* at 97−98.

[7] Although she never made a formal or informal complaint, Banks also alleges Thompson acted inappropriately by grabbing her and pulling her to him, asking for a date, and occasionally touching her or stroking her hair. Banks Dep., [121-6] at 60−61.

response when he discovered that Kemper made complaints against him was to show Byrd a gun and ask her if she too was going to "snitch." Byrd Dep., [121-24] at 143.

Byrd's term employment was extended several times under Thompson's authorization. Pls.' Mot. Partial Summ. J., ECF No. 121-24, Ex. 23 ["Byrd Personnel File I"]. She suggests the harassment would intensify to its apex shortly before her term was due to end and that Thompson used his supervisory status to coerce her agreement to sexual acts. Byrd Dep., [121-24] at 80–81, 161. Thompson notified Byrd on August 1, 2002 that her employment was set to expire on September 30, 2002, and that DPR could make no commitments to continue her employment but would notify her if there was a "change in her status." Pls.' Opp'n DMSJ, ECF No. 133-1, Ex. 27 ["Byrd Personnel File II"]. Despite some suggestions that Thompson complained of Byrd's work performance, he repeatedly requested the renewal or modification of her term, including the extension of her term from ninety days to thirteen months. *Id.*; Banks Dep., [121-6] at 22–25. Approximately one year after coming to Half Street, Byrd spoke to Roberts and told her "she was being touched by her supervisor" in a sexual way. Roberts Dep., [121-10] at 30. Roberts told Byrd she needed "to take that complaint somewhere else," and did not direct her further. *Id.* According to Roberts, Byrd's complaint occurred "before we had any sexual harassment training" and therefore she did not know of her responsibility as a manager to document and report claims. *Id.* at 31.

Acting on lingering feelings of suspicion, Maintenance Supervisor Banks approached Byrd in early 2005 after seeing her visibly upset at work. Banks Dep., [121-6] at 31–33, 36–45. In response to Byrd's description of Thompson's ongoing behavior, Banks advised her to report the harassment to DPR's Human Resources department. *Id.* at 37. Despite completing training as an Equal Employment Opportunity Commission ("EEOC") counselor, Banks testified that she

did not know where or to whom she was supposed to report harassment complaints.  *Id.* at 109.

Next, Byrd contacted Arnita Bonner from DPR's Human Resources department. Although the

precise events that followed are disputed, it appears Byrd was temporarily transferred to a

different location. *See* Pls.' Reply Statement of Material Facts, ECF No. 135-1, at ¶ 106 ["P's

Reply SOF"]; Byrd Dep., [121-24] at 125, 127–28.  On April 6, 2005, Byrd filed a complaint

with the D.C. Office of Human Rights ("DCOHR") describing the harassment she suffered as

Thompson's long-time subordinate. Pls.' Opp'n DMSJ, ECF No. 132-25, Ex. 29, ["Byrd EEOC

Charge"].

     Byrd does not recall receiving any sexual harassment training or information regarding

DPR's sexual harassment policy prior to filing her complaint in 2005. Byrd Decl., 132-19; Byrd

Dep. [121-24].

### b. The Lerner Investigation and Dismissal of Darnell Thompson

     On April 7, 2005, the day following Byrd's EEOC filing, Deborah Jackson, AFGE Local

2741 Union President, wrote a letter to D.C. Council Member Kathy Patterson regarding DPR

management's conscious disregard of Thompson's persistent, inappropriate behavior. Pls.' Mot.

Partial Summ. J., ECF No. 121-35, Ex. 33 ["AFGE Memo"] ("To this day, sexual harassment is

on-going and Interim Director Neil Stanley is aware and reluctant to do anything to terminate

this seemingly acceptable practice and behavior.").  President Jackson expressed the following

concerns on behalf of the AFGE Local 2741: three to six allegations of sexual harassment

against the Chief of Facility Maintenance were brought without an internal investigation during

Directors Albert and Stanley's tenures; the Union had repeatedly requested that Thompson be

removed from his position; and all of the women who came forward were dismissed from their

employment because they were temporary employees. *Id.* Ms. Patterson contacted Stanley and

requested an investigation. *See* Pls.' Reply SOF, [135-1] at ¶ 156. Thompson was placed on paid administrative leave, effective April 13, 2005, while an "investigation [was] pending regarding allegations of harassment." Def.'s Opp'n PMSJ, ECF No. 129, Ex. U.

Prompted by external pressure from the AGEF Local 2741 and the D.C. Council, Interim Director Stanley hired private consultant Carolyn Lerner to conduct an independent investigation into Byrd's complaints "because there had been previous complaints against Thompson, and because of the seriousness of Byrd's allegations." Pls.' Mot. Partial Summ. J., ECF No. 121-28, Ex. 26 ["Lerner Report"]. Many employees were interviewed through this process, including those directly implicated and those with peripheral knowledge.[8] *Id.* A preliminary report issued on June 15, 2005 concluded that "Byrd's complaint is credible." *Id.* at 28. The Lerner Report advised that the termination of Thompson "would be in the best interest of the efficiency of the Department and in the interest of the safety of its employees." *Id.* at 28. With regard to further DPR action, Lerner recommended: (1) "the development and Department-wide dissemination of detailed, Department-specific policies on sexual harassment, including procedures for supervisors to follow once they are on notice of a claim and options for employees who witness or are subject to harassment;" (2) "the development of a comprehensive sexual harassment prevention training program;" and (3) "separate training programs for supervisors/managers and employees on preventing and identifying sexual harassment, as well as Department policies and procedures." *Id.* Thompson was subsequently fired for "disciplinary reasons" on August 9, 2005. Def.'s Opp'n PMSJ, ECF No. 129, Ex. V.

---

[8] Besides interviewing Thompson and Byrd themselves, Lerner interviewed the following employees because of their potential knowledge of Thompson's relationship with Byrd or of either complaints of harassment against Thompson: Banks, Stanley Dickson, Leon Harris, Gwathmey, Jackson, Jonnie Richardson, James Gripper, Chaney, and Roberts. Preliminary Lerner Report, [121-28] at 3–4. Former employees who had complained about Thompson in the past were noted as "witnesses to be interviewed," including: Kemper, Burns, Gaskins, and Williams. *Id.*

Byrd continued to pursue her allegations with persistent determination despite a noticeable absence of support from her DPR supervisors and co-workers. Accompanied by her attorney, Byrd testified before the D.C. Council on December 8, 2005, explicitly detailing the harassment she endured at Thompson's hands. Pls.' Opp'n DMSJ, ECF No. 132-19, Ex. 22, at ¶ 10 ["Byrd Decl."]. DPR issued an internal personnel action—notably with an authorization signature dated December 8, 2005—approving the final expiration of Byrd's term, which was previously set to expire on December 31, 2005. Byrd's Personnel File II, [133-1]. On December 29, 2005, Byrd received a letter from Deputy Director Roslyn Johnson notifying her that her employment term would not be extended when it expired. Def.'s Mot. Partial Summ. J., EFC No. 125, Ex. J ["Byrd Termination Letter from DPR"]. Deputy Johnson's letter noted that Byrd was appointed to the position of Clerical Assistant on May 1, 2002, and that the term's expiration date was December 31, 2005. *Id.* According to DPR records, Byrd's final day at DPR was December 31, 2005. Byrd's Personnel File II, [133-1].

As rumors of Thompson's behavior became known outside of DPR's protective infrastructure, Burns, Gaskins, and other employees came forward with their own charges of abuse by Thompson. After speaking with an attorney during the summer of 2005 and contacting DPR for her employment records that fall, Burns filed a complaint with the DCOHR on February 3, 2006—746 days after the final expiration of her term. *Id.* at ¶ 13; Pls.' Opp'n DMSJ, ECF No. 132-25, Ex. 29, ["Burns EEOC Charge"].

Byrd believes that her DPR employment ended because she was the first woman to publically acknowledge the harassment she suffered at DPR. The potential windfall of costly litigation not only implicated Thompson, but also placed the upper echelons of DPR administration under a microscope.

## 2. Carmen Jean-Baptiste

Jean-Baptiste was hired in May of 2006, well after Thompson was fired and investigations of sexual harassment within DPR were underway. Pls.' Opp'n DMSJ, ECF No. 132-6, Ex. 5 ["Jean-Baptiste Dep."] Jean-Baptiste was under the impression that she had been hired for a year-round position upon her placement as a summer lifeguard at the Takoma Pool, but DPR claims it was only a seasonal position set to expire at the end of the summer. Jean-Baptiste Dep., [132-2] at 99; Pls.' Opp'n DMSJ, ECF No. 133-1, Ex. 4 ["Jean-Baptiste Personnel File"].[9] Early that summer, Jean-Baptiste was assigned to report to Rodney Weaver, Assistant Pool Manager, and Robert Ford, Pool Manager. Jean-Baptiste Dep., [132-2] at 100–01. According to Jean-Baptiste, Weaver began to engage in sexually harassing and demeaning behaviors, which grew progressively worse. *Id.* at 122–27. She alleges that Weaver: asked constant questions about her romantic life, asked her out on dates, made lewd comments about her body parts, pulled her hair while simultaneously making sexually suggestive statements, touched her inappropriately, and directed her to get out of the pool while staring at her crotch. Jean-Baptiste says she asked Weaver to stop and told him she would file a complaint if he did not. *Id.* at 160–64, 168–69, 176–77.

After allegedly fruitless complaints to DPR's Aquatics Director, Harold Houston, Jean-Baptiste complained to Evening Manager Margarita Cruz. *Id.* at 151, 156, 168–69. Cruz reported the allegations to her supervisors, Pool Managers Ford and Sean Link. Pls.' Opp'n DMSJ, ECF No. 132-10, Ex. 9, at 21 ["Cruz Dep."]. Cruz, Weaver, Ford, and Link held a meeting to discuss Jean-Baptiste's allegations. Ford told Cruz that he did not believe the

---

[9] Included in Jean-Baptiste's personnel file is a document, submitted by Benjamin McCottry April 27, 2006, labeled "Human Resources Development Manager Request Form," requesting her year round hire as a Takoma Pool Lifeguard. The three to six week processing time required for approval was "inclusive of position qualification, second interview (in some cases), background and reference checks, salary negotiation, DCOP formal offer and employee acceptance."

complaint and was not going to do anything about it. *Id.* at 43. After Cruz excused herself from the room, she heard the remaining men joking and laughing about who was going to "successfully seduce" Jean-Baptiste first.[10] *Id.* at 24. Weaver angrily confronted Jean-Baptiste after the meeting and told her that the accusations could have cost him his job. Jean-Baptiste Dep., [132-2] at 171−72. She explains that did not report the complaints to Human Resources at that time because Weaver and Ford had threatened to transfer her, write her up for subordination, change her schedule, or have her fired. *Id.* at 237−38.

In mid-June, Ford was demoted and Solomon Robinson was promoted to Area Supervisor. Pls.' Opp'n DMSJ, ECF No. 132-8, Ex. 7, at 21 ["Robinson Dep."]. Robinson and Weaver had been friends for over 15 years. *Id.* at 8, 10−11, 66. Jean-Baptiste next brought her complaints to Robinson. Jean-Baptiste Dep., [132-2] at 174−76. Prompted by her accusations, Robinson called both Jean-Baptiste and Weaver into his office and made her state her allegations in front of Weaver. Robinson Dep., [132-8] at 17−19, 23. Weaver did not directly dispute her story. *Id.* at 24.

According to Robinson, summer lifeguards are generally kept on after the summer if their supervisors recommend them. *Id.* at 52−54. At the end of the summer, Jean-Baptiste was informed that DPR would not retain her past September 29, 2006 or consider her for a permanent lifeguarding position. Jean-Baptiste Dep., [132-2] at 203. Shocked by this revelation, Jean-Baptiste—who still believed she was a year-round employee—contacted DPR Director Roslyn Johnson and Aquatics Director Harold Houston about her termination and allegations of harassment. *Id.* at 202−03. Jean-Baptiste was granted a two-week extension of her employment at a different pool to determine whether DPR's budget would allow for her hire year-round. Pls.'

---

[10] At that time, Cruz had filed a complaint of harassment on her own behalf against Ford.

Opp'n DMSJ, ECF No. 132-15, Ex. 14 ["Jean-Baptiste and DPR Correspondence"].  During this time, she periodically informed Houston and Interim Director Rodgers of her extensive qualifications to persuade them to continue her employment.  *Id.*  On October 14, 2006, she sent an e-mail to Houston, copying Rodgers and the EEOC, naming Weaver as her harasser and informing DPR that she would "be taking legal action to stop harassment."[11]  Pls.' Opp'n DMSJ, ECF No. 132-12, Ex. 11 ["Jean-Baptiste Email to Houston"].  Attached was detailed narrative of her interactions with Weaver and other DPR supervisors between April 2006 and July 2006.  Following up on inquiries regarding her employment status, she e-mailed Rodgers on October 16, 2006 demanding an explanation for her termination and implying that DPR engages in discriminatory employment practices.[12]  Jean-Baptiste and DPR Correspondence, [132-15].  A copy of the allegations she emailed on October 14, 2006 was hand-delivered to DPR's Human Resources department on October 17, 2006, the same day Houston informed Jean-Baptiste that he was "letting her go" and that she no longer worked for DPR. Pls.' Opp'n DMSJ, ECF No. 132-13, Ex. 12 ["DPR Receipt of Hand-Delivery"]; Jean-Baptiste Dep., [132-2] at 196–97.

On October 18, 2006, Jean-Baptiste submitted a formal job application to DPR after meeting with Houston and Rodgers to discuss her desire to continue her employment. Jean-Baptiste Dep., [132-2] at 209–10. Although Jean-Baptiste had previously passed a swim

---

[11] On August 12, 2005, one year before Jean-Baptiste's charges, DPR employee Juanchetta Parker lodged complaints of sexual harassment against Weaver with EEO Officer Terrance Reddick.  By August 18, 2005, Reddick had filed a report finding no merit to Parker's claims.  Pls.' Opp'n DMSJ, ECF No. 133-1, Ex. 15 ["Parker Complaint File"].

[12] Jean-Baptiste's letter to Rodgers informed him that until September 29, 2006 she believed she had been hired for a year round position, per the recommendation of DPR administrator Benjamin McCottry upon her initial hire in May.  Specifically she inquired why she was not informed of the application procedure for year-round hire and further why she was not on the list of candidates for year-round employment submitted by her managers for Houston's consideration despite the inclusion of several less-qualified applicants.  In a fiery conclusion, she insisted to know why "such an unfairly large majority of the hires were male," why she "was overlooked in light of [her] instructor's certifications making [her] more qualified than most of the people on the list," and demanded to know "if managers usually bring on less qualified candidates every year, or [was] this something new."  Jean-Baptiste and DPR Correspondence, [132-15].

assessment to become a summer lifeguard, Houston suggested that she needed to take another test to dispel rumors of her "weak swimming skills," which had arisen from Link's explanation of why Jean-Baptiste was not considered for year-round employment. *Id.* A swim assessment was conducted on October 19, 2006. Jean-Baptiste and DPR Correspondence, [132-15]. Despite holding water safety instructor certification, American Red Cross lifeguard certification, pool operators' certification, and water aerobics certification Jean- Baptiste was deemed to have failed. Jean-Baptiste alleges that this assessment was unfairly conducted and deviated from DPR's usual requirements. *Id.* She claims that her assessment took place in only twelve feet of water while other employees were assessed in four feet; that she was required to demonstrate back boarding skills not normally required by DPR or the American Red Cross for lifeguard certification; and that employees assigned to assist her with back boarding were improperly trained. *Id.* Despite the obvious existence of a record of Jean-Baptiste's skills assessment, DPR did not produce any such record. *Id.* By October 21, 2006, Jean-Baptiste was informed that her application for continued employment had been rejected. *Id.*

### B. Procedural History

Byrd independently filed a complaint against the District of Columbia on March 20, 2006. Her two-count action alleged that the District had sexually discriminated against her by creating a hostile work environment and taking adverse employment actions in retaliation for her complaints. Pl.'s Compl., Mar. 20, 2006, ECF No. 1. She filed minor amendments to this complaint on June 20, 2006. Pl.'s Am. Compl., June 20, 2006, ECF No. 13. On October 16, 2006, Byrd filed two motions; the first requested leave to file a second amended complaint, adding Burns as a plaintiff, Pl.'s Mot. For Leave to File Second Am. Class Compl., Oct. 16, 2006, ECF No. 24., and the second sought to consolidate her case with *Burns v. District of*

*Columbia*, Case No. 1:06-CV-01198 (RBW). Pl.'s Mot. Consolidate Related Cases, Oct. 16, 2006, ECF No. 25. The same day, Burns—individually and on behalf of all other similarly situated female DPR employees who were at any point supervised by Thompson—filed a class action suit against the District alleging that it maintains a pattern and practice of discrimination in employment. *Id.* at [24-2].

Judge Henry H. Kennedy granted Byrd leave to further amend her complaint and referred the Motion to Consolidate to Magistrate Judge Kay for his determination. Kay Order, Nov. 23, 2006, ECF No. 34. Upon receiving permission to amend her complaint, Byrd withdrew her motion for consolidation and jointly filed to dismiss Burns' separate action. Pl.'s Notice of Withdrawal of Motion, Feb. 27, 2007, ECF No. 43. Plaintiffs' Second Amended Class Action Complaint asserted that the District had engaged in discrimination against Byrd and similarly situated female employees by maintaining and condoning discriminatory practices in the workplace. The complaint further alleged that because the class members' claims involved a systematic pattern of discrimination, those claims would be most efficiently resolved together because they implicate common questions of fact concerning DPR's policies, procedures, and sexual harassment training. Second Am. Class Action Compl., Nov. 23, 2006, ECF No. 35 at ¶¶ 2, 59–61. The defined class consisted of "all female persons who are working, or have worked, for the District of Columbia's Department of Parks and Recreation at any time since 2000 to the present," and was expected by plaintiffs to include over thirty more employees—making joinder impractical. *Id.* ¶ 57.

Plaintiffs subsequently requested leave to file a third amended complaint for the purposes of adding Gaskins and Jean-Baptiste as plaintiffs and withdrawing the class action allegations. Pl.'s Mot. For Leave to File Third Am. Compl., May 11, 2007, ECF No. 44. Magistrate Judge

Kay granted leave to file in July of 2005. Kay Mem. Order, July 5, 2007, ECF No. 50. At that stage of the litigation, the Court found there was enough of a logical connection and factual overlap among the four plaintiffs' claims to sufficiently meet Federal Rule of Civil Procedure 20(a)'s two-prong standard for permissive joinder. *Id*. at 6–7. Specifically, Magistrate Judge Kay found that (1) plaintiffs' claims all allegedly arose from the same series of transactions through a company-wide practice of systematic discrimination; and (2) their claims all involve common questions of law and fact. *Id*. He also concluded that defendant's judicial efficiency concerns that were raised before the discovery phase of litigation were premature. *Id*. at 8. The court did recognize the future possibility that jury confusion would cause undue prejudice to the District, but shelved that concern until the facts of the case became more fully developed. *Id*. Concluding that the present benefits and efficiency served by joinder during discovery outweighed any later risk of prejudice, the Court did not foreclose the District from later seeking severance. *Id*. at 8–9.

Plaintiffs' Third Amended Complaint includes seven individual causes of action against the District. Third Am. Compl., July 5, 2007, ECF No. 41. The plaintiffs bring all the counts on behalf of all four women with the exception of Count VII, which they bring solely on behalf of Byrd and Jean-Baptiste. Specifically, plaintiffs bring the following counts:

> **Count I:** Plaintiffs allege that the District illegally subjected them to a hostile working environment, sexual harassment, and *quid pro quo* discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

> **Count II:** Identical to Count I, but brought under the D.C. Human Rights Act ("DCHRA"), D.C. Code § 1401.

> **Count III:** Plaintiffs allege that the District violated their Fifth Amendment rights, via governmental policies or customs that tolerate ongoing sexual harassment, pursuant to 42 U.S.C. § 1983.

**Count IV:** Plaintiffs allege that the District unlawfully retaliated against them for complaining about sexual discrimination in violation of Title VII.

**Count V:** Identical to Count IV, but brought under the DCHRA.

**Count VI:** Plaintiffs allege that the District violated their First Amendment rights protecting speech by retaliating against them for complaining about sex discrimination, pursuant to 42 U.S.C. § 1983.

**Count VII:** Byrd and Jean-Baptiste allege the District retaliated against them for complaining about sex discrimination, in violation of the D.C. Whistleblowers Protection Act ("DCPWA"), D.C. Code § 1-615.52.

In August 2007, the District moved to dismiss portions of the plaintiffs' action. Def.'s Mot. Dismiss, Aug. 6, 2007, ECF No. 54. In March 2008, Judge Kennedy granted in part and denied in part the District's motion. Kennedy Mem. Op., Mar. 13, 2008, ECF No. 71. Having considered the District's arguments concerning Burns and Gaskins' failure to exhaust their administrative remedies, the court dismissed Burns and Gaskins' DCHRA claims for exceeding the one-year statute of limitations for filing suit. But the Court allowed their Title VII claims to proceed with further discovery to determine if any factual basis existed for excusal from the time limits. *Id.* at 5–9.

In October 2009, plaintiffs moved for summary judgment seeking (1) judgment on Burns, Byrd, and Gaskins' Title VII and Byrd's DCHRA hostile work environment claims; or alternatively (2) a finding that the District may not assert an affirmative defense to vicarious liability with respect to those claims; and lastly (3) judgment for Burns, Byrd, and Gaskins' Section 1983 claims through the Fifth Amendment. Pls.' Mot. Partial Summ. J., Oct. 9, 2009, ECF No. 121, ["PMSJ"]. The District opposed plaintiffs' motion and cross-moved for summary judgment on (1) all of Gaskins and Burns' Title VII claims for failure to exhaust their administrative remedies; (2) Byrd, Burns, Gaskins, and Jean-Baptiste's Title VII and DCHRA

retaliation claims; (3) Byrd and Jean-Baptiste's DCWPA retaliation claims; and lastly (4) all Section 1983 claims. Def.'s Mot. Partial Summ. J., Oct. 16, 2009, ECF No. 123, ["DMSJ"].

Not long after these motions were fully briefed, the District filed a motion asking the court to sever the action into four separate actions pursuant to Federal Rule of Civil Procedure 21, or alternatively order four separate trials under Federal Rule of Civil Procedure 42. Def.'s Mot. Sever, Sept. 16, 2010, ECF No. 155 ["DMSA"]. The case was reassigned to this Court on May 4, 2011.

## III.    SUMMARY JUDGMENT STANDARD

Courts grant summary judgment when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c). This standard requires more than the mere existence of *some* factual dispute between the parties to defeat an otherwise properly supported motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is material if, under the substantive law applicable to the case, it is capable of affecting the outcome of the litigation. *Id.* A dispute is a "genuine" for summary judgment purposes if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009) (citing *Anderson*, 477 U.S. at 248).

In seeking summary judgment, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those potions [of the evidence in the record] which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this burden has been met, the

non-moving party must "go beyond the pleadings and by [her] own affidavits, or by [the

evidence in the record] designate specific facts showing that there is a genuine issue for trial."

*Id.* at 324 (quotations omitted). The non-moving party's opposition "must consist of more than

mere unsupported allegations or denials and must be supported by affidavits, declarations or

other competent evidence, setting forth specific facts showing that there is a genuine issue for

trial." *Doe*, 706 F. Supp. 2d at 5; *see also Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840,

845 (D.C. Cir. 2001) (holding that plaintiff must have more than "a scintilla of evidence to

support [her] claims").

　　In other words, the non-moving party is required to point to evidence that would permit a

reasonable jury to find in her favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242

(D.C. Cir. 1987). Additionally, because "[c]redibility determinations, the weighing of the

evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a

judge," the "the evidence of the non-movant is to be believed, and all justifiable inferences are to

be drawn in [her] favor." *Anderson*, 477 U.S. at 255. Where cross-motions for summary

judgment are at issue, the question for the Court is whether the evidence presented by either side

is such that no material issue of fact remains. *Fowler v. Dist. of Columbia*, 404 F. Supp. 2d 206,

209 (D.D.C. 2005). Because it is difficult for a plaintiff to establish proof in cases involving

discrimination, the D.C. Circuit has instructed district courts to view summary judgment motions

with special caution, applying a heightened degree of scrutiny. *Turner v. Dist. of Columbia*, 383

F. Supp. 2d 157, 166 (D.C. Cir. 2005) (citing *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80

(D.C. Cir. 1997)); *see also Thomas v. Vilsack*, 718 F. Supp. 2d 106, 115 (D.D.C. 2010);

*Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 4 (D.D.C. 2000).

## IV.    ANALYSIS

### A.    Title VII and DCHRA Claims

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against its employees in hiring decisions, compensation, terms, conditions, or privileges of employment on the basis of an individual's sex.  42 U.S.C. § 2000e-(2)(a)(1).  A claim of sexual harassment is cognizable under the Act if it explicitly or constructively alters the terms or conditions of an individual's employment.  *Curry v. Dist. of Columbia*, 195 F.3d 654, 659 (D.C. Cir. 2000).  Because it is well-established that the DCHRA[13] and Title VII employment discrimination actions are evaluated under the same legal standard, the following analysis applies to both claims where implicated.[14]  *See, e.g.*, *Elhusseini v. Compass Grp. USA, Inc.*, 578 F. Supp. 2d 6, 10 n.4 (D.D.C. 2008) ("[W]hen construing the DCHRA courts should look to precedent construing Title VII."); *Regan v. Grill Concepts-D.C., Inc.*, 338 F. Supp. 2d 131, 134 (D.D.C. 2004).

> ### 1.    Gaskins and Burns may not pursue their Title VII claims against the District because they failed to properly exhaust their administrative remedies or provide any basis to waive the procedural requirements

The District argues the Court should grant judgment in its favor with respect to Burns and Gaskins' Title VII claims because they failed to exhaust their administrative remedies by timely filing a complaint with D.C. Office of Human Rights ("DCOHR") or the EEOC.  Burns and Gaskins concede that they did not make a charge within the 300-day deadline from the date of the discrimination—the last day of their individual employment at DPR. Thus, the only issue here is whether the Court should apply its equitable discretion to toll the statute of limitations.

---

[13] DCHRA prohibits certain discriminatory practices by employers based upon sex. D.C. Code § 2-1402.11(a)(1).

[14] Plaintiffs' DCHRA claims are identical to their Title VII claims.  Only plaintiffs Byrd and Jean-Baptiste have viable DCHRA claims at this stage of the litigation.

Before filing a Title VII suit against an employer, an employee must adequately exhaust her administrative remedies within the manner and time limits prescribed by statute. *Baird v. Snowbarger*, 744 F. Supp. 2d 279, 286 (D.D.C. 2010). Due to a work sharing agreement between the EEOC and the DCOHR, an employee in the District of Columbia is required to file an EEOC charge within 300 days of alleged discrimination.[15] *Tucker v. Howard Univ. Hosp.*, 764 F. Supp. 2d 1, 6 (D.D.C. 2011) (citing *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 568–69 n.13 (D.C. 2007)).

The procedural requirements governing a plaintiff's right to bring a Title VII claim are "part and parcel of the congressional design" to give employers an opportunity to first handle matters internally whenever possible, and to ensure that federal courts are burdened only when reasonably necessary. *Winston v. Clough*, 712 F. Supp. 2d 1, 7 (D.D.C. 2010) (internal citations omitted); *see also Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of . . . sympathy for particular litigants."). At the same time, administrative time limits created by the EEOC do not create a jurisdictional bar to bringing a Title VII suit, but function as a statute of limitations. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). A plaintiff's untimely exhaustion of administrative remedies is thus an affirmative defense, and the defendant first bears the burden of proving the inadequacy of the plaintiff's actions. *Id.* The plaintiff then bears the burden of pleading and proving facts supporting any reason for an equitable extension of administrative time limits. *Hines v. Bair*, 594

15 To properly comply with administrative procedural requirements, a plaintiff must file a complaint with the EEOC within 180 days of the alleged unlawful employment practice or within 300 days of the alleged unlawful employment practice if the aggrieved party has instituted proceedings with a state or local agency with the authority to grant or seek relief. 42 U.S.C. § 2000e-(5)(e)(1).

F. Supp. 2d 17, 23 (D.D.C. 2009) (citing *Armstrong v. Reno*, 172 F. Supp. 2d 11, 21 (D.D.C. 2001)).

It is solely within judicial discretion to apply equitable considerations to excuse a plaintiff's failure to meet administrative time limits. *Smith-Haynie v. Dist. of Columbia*, 155 F.3d 575, 579 (D.C. Cir. 1998). Title VII's remedial purpose permits time limits to be "subject to waiver, estoppel, and equitable tolling 'when equity so requires.'" *Winston*, 712 F. Supp. 2d at 7 (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002)). The D.C. Circuit has firmly established that this discretion is applied sparingly and exercised only in "extraordinary and carefully circumscribed instances." *Smith-Haynie*, 155 F.3d at 579 (citing *Mondy v. Secretary of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1998)). Under specific circumstances, a court may alternatively apply the "single filing exception" to allow a plaintiff who failed to adhere to administrative requirements to vicariously exhaust her filing responsibilities via another plaintiff's timely filed EEOC claim. *Brooks v. Dist. Hosp. Partners, L.P.*, 606 F.3d 800, 807 (D.C. Cir. 2010) (citing *Foster v. Gueory*, 655 F.2d 1319, 1323 (D.C. Cir. 1981)).

Counsels' arguments, and select applicable jurisprudence, conflate the equitable tolling and equitable estoppel doctrines. Although both operate in a practical sense to toll a limitations period, each has distinct criteria; "[w]hereas equitable tolling allows a plaintiff to avoid the bar of the limitations period if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim, equitable estoppel prevents a defendant from asserting untimeliness where the *defendant* has taken active steps to prevent the plaintiff from litigating in time." *Currier v. Radio Free Europe/Radio Liberty, Inc.*, 159 F.3d 1363, 1367 (D.C. Cir. 1999)

(citing *Irwin v. Dept. of Veteran Affairs*, 498 U.S. 89, 96 (1990)) (emphasis in original) (citing *Smith-Haynie*, 155 F.3d at 579).

### a. Burns failed to exhaust her administrative remedies or produce sufficient evidence for equitable avoidance

Burns filed an EEOC complaint on February 3, 2006, more then 700 days after the expiration of her last term of employment.[16] Burns argues that she failed to timely file due to DPR's actions (or inactions), and that the 300-day time limit should toll until she first learned of Title VII via her attorney in August 2005. Burns urges the Court to extend the time period during which she was permitted to file a charge by applying the doctrine of equitable tolling, or alternatively, equitable estoppel.

Because equitable tolling permits the extension of the limitations period if a plaintiff lacked information essential to her claim, Burns argues that her unawareness of either a legal right to redress or the time limit restraining an ability to do, prevented her from timely filing a complaint. *See, e.g.*, *Smith-Haynie,* 155 F.3d at 579 (finding the equitable tolling doctrine encompasses cases where a plaintiff was unable to obtain information because of a disability) (citing *Cada v. Baxter Healthcare Corp*., 920 F.2d 446, 451 (7th Cir. 1990)). She contends that her ignorance was a consequence of DPR's failure to conspicuously post required EEOC notices or otherwise inform its employees of federal laws and procedures protecting them from harassment. Thus, she argues, administrative requirements should be tolled until she was educated of her rights.

---

[16] Burns disputes whether this was actually the last day she worked at DPR, but has provided no evidence to contradict this date.

Burns is partially correct: employers do have a statutory duty to post EEOC notices. 42 U.S.C § 2000e-10(a)–(b).[17] But this Circuit has yet to squarely address in what circumstances a non-federal employer's violation of EEOC posting requirements affects the application of common law equitable tolling principles.[18] Burns urges the Court to follow other circuits' holdings that an employer's failure to post EEOC notices tolls the filing deadline. *See, e.g.*, *Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41, 48 (1st Cir. 2005) ("[W]here appellants have asserted that no informational notices were posted and that they had no knowledge of their legal rights until informed by their attorney, they have met the threshold requirements for avoiding dismissal of their Title VII suit."); *accord EEOC v. Ky. State Police Dep't*, 80 F.3d 1086, 1096 (6th Cir. 1996); *Callowhill v. Allen-Sherman-Hoff Co*., 832 F.2d 269, 272 (3d Cir. 1987); *McClinton v. Ala. By-Prod. Corp.*, 743 F.2d 1483, 1486 (11th Cir. 1984). In response, the District emphasizes that courts that have permitted tolling due to a violation of federal posting requirements have done so only until a plaintiff had actual knowledge of her rights or retained an attorney. *Id.* In this instance, the parties disagree over the extent and nature of Burns' knowledge; while the District argues that she generally knew of her right to seek legal redress, Burns asserts that she only knew that Thompson's behavior was wrong, and not illegal.[19]

---

[17] "Every employer . . . shall post and keep posted in conspicuous places upon its premises . . . a notice to be prepared or approved by the Commission setting forth excerpts from . . . pertinent provisions of this subchapter and information pertinent to the filing of a complaint . . . . willful violation of this section shall be punishable by a fine of not more than $100 for each separate offense." 42 U.S.C § 2000e-10(a)–(b).

[18] This Circuit has considered the effects of EEOC posters on tolling in the federal employee context. However, the court granted an extension of the time limit on an independent basis for tolling under 29 CFR § 1614.105(a)(2) and thus did not apply the more demanding common law standard guiding non-federal employers. *Harris v. Gonzales*, 488 F.3d 442, 444 (D.C. Cir. 2007); *see also Aceto v. England*, 328 F. Supp. 2d 1, 5 (D.D.C. 2004).

[19] As proof of her actual knowledge, the District identifies the deposition of Leslie Green, a Project Arise employee, who testified that she recalls telling Burns to report her allegations to "either EEO or whoever [she] was told" per her supervisor's instructions. Def.'s Mot. Partial Summ. J., ECF No. 125, Ex. A. Despite claiming that Burns "was specifically instructed to go the EEOC," the District's evidence does not refute her claims of ignorance of the law. Def.'s Reply DMSJ, Feb. 22, 2010, ECF No 140 at 5.

The Court need not speculate about the distinctions in Burns' mind as to the quality of wrongness—legal or moral—of the discrimination she allegedly suffered, because her requests must be denied in light of her failure to meet the due diligence requirement for equitable tolling. *See generally Norman v. United States*, 467 F.3d 773, 776 (D.C. Cir. 2006) (citing *Irwin*, 498 U.S. at 96 (1990)).[20]  The Supreme Court applies equitable tolling "only sparingly" and generally denies relief where a plaintiff has "failed to exercise due diligence in preserving his legal rights." *Irwin*, 498 U.S. at 96 (citing *Baldwin Cnty. Welcome Ctr.*, 466 U.S. at 152).  Even assuming that Burns did not specifically know of her legal right to file suit, she did not take reasonable steps to obtain the knowledge she lacked.  Burns felt as though DPR had ignored her complaints and had retaliated against her because of them, but she did not attempt to follow up with anyone at DPR or any other organization after making her initial complaints.  *See Johnson v. Holder*, 598 F. Supp. 2d 50, 54 (D.D.C. 2009) (explaining that a plaintiff's failure to act on suspicions that he had been a victim of harassment was sufficient to start the clock on the applicable filing deadline).  After she spoke with Albert in 2002, no one from DPR contacted Burns regarding her complaint, leading her to conclude that DPR had not conducted an investigation and did not take her complaint seriously.  Despite feeling greatly wronged, Burns made no effort to further inquire about the status of her complaint or to follow up with the AFGE Local 2741 or Project Arise staff during the time she continued to work for DPR after the incident.

More then a year after her termination from DPR, Burns sought counsel in August 2005. It was at this time that she claims to have first learned that "she had legal rights protecting her from sexual harassment" and promptly "proceeded with due diligence to pursue them."  Pls.' Opp'n DMSJ, ECF No. 132, at 7.  Despite being newly enlightened as to the illegality of

---

[20] The common law principles of equitable tolling apply as a general legal doctrine in a variety of contexts, including Title VII and discrimination cases. *See Smith-Haynie*, 155 F.3d at 579 n.5.

discrimination, Burns waited over three months until November 2005 to contact DPR and request her personnel records and records of her internal complaint. She then waited until February 3, 2006 to file her charge with the EEOC—746 days after her last day at DPR, 466 days after the lapse of the filing deadline, and nearly four years after the April 2002 incident in Thompson's office.

Considering this timeline and the circumstances surrounding Burns' complaints, the facts do not amount to "extraordinary and carefully circumscribed circumstances" warranting equitable tolling. *Mondy*, 845 F.2d at 1057. Although DPR defaulted on its statutory duties and arguably failed to effectively respond to Burns' complaints, an employee may not remain complacent in the face of discrimination, nor is she relieved of a duty to diligently pursue her charges. *See Marshall v. Honeywell Technology Solutions, Inc.*, 536 F. Supp. 2d 59, 68 (D.D.C. 2008) (concluding that even if the plaintiff was misinformed, due diligence was not established where the plaintiff filed 735 days after the discriminatory act and 435 days after the lapse of the limitations period); *see generally Baldwin Cnty. Welcome Ctr.*, 466 U.S. at 151. The Court must draw the line at some point; in this instance, Burns simply waited too long.

Turning to the doctrine of equitable estoppel, the general rule is that a defendant must engage in "affirmative misconduct" for equitable estoppel to apply. *Moore v. Chertoff,* 424 F. Supp. 2d 145, 150 (D.D.C. 2006); *White v. Geithner*, 602 F. Supp. 2d 35, 38 (D.D.C. 2009) (requiring a plaintiff to "come forward with specific proof of an employer's affirmative acts or misleading statements that prevented her from filing an EEO complaint." (quoting *Klugel v. Small*, 529 F. Supp. 2d 66, 73 (D.D.C. 2007))). According to Burns, the "affirmative action" that prevented her from asserting her legal rights was DPR's intentional withholding of information. On this line of reasoning, DPR's "multiple acts of wrongdoing" include: failing to post requisite

EEOC notices, failing to disseminate any sexual harassment policy, and failing to respond to Burns' complaints or inform her how to proceed with an EEOC charge. Pls.' Opp'n DMSJ, ECF No. 132, at 16.

Even assuming that all of these assertions are true, DPR's deficient employment practices—while unwise and perhaps unjust—do not amount to affirmative misconduct. This Court has applied equitable estoppel when an employer's *actions* interfered with an employee's complaints; here, DPR's *inaction* allegedly prevented Burns from filing a complaint. *See, e.g.*, *Smith-Thompson v. Dist. of Columbia*, 657 F. Supp. 2d 123, 132 (D.D.C. 2009) ("Such misconduct typically involves 'acts of wrongdoing such as hiding evidence or promising not to rely on a statute of limitations defense.'" (quoting *Hedrich v. Bd. of Regents of Univ. of Wis. Sys.,* 274 F.3d 1174, 1182 (7th Cir. 2001)); *Currier*, 159 F.3d at 1368 ("[E]mployer's affirmatively misleading statements that a grievance will be resolved in the employee's favor can establish an equitable estoppel."); *Sanders v. Veneman*, 131 F. Supp. 2d 225, 230 (D.D.C. 2001) (applying equitable estoppel where a plaintiff's supervisor made repeated promises of an eventual promotion). Burns relies on the holding in *Smith-Thompson* to support her claim for estoppel, arguing that both she and the plaintiff in that case lacked legal counsel yet "proceeded diligently in their attempts to protect their rights despite their lack of knowledge of how to do so." Pls.' Opp'n DMSJ, ECF No. 132, at 17. But Burns omits a key factor in the *Smith-Thompson* court's reasoning: the plaintiff alleged that her employer told her that she was not allowed to file a complaint elsewhere prior to following internal grievance procedures. 657 F. Supp. 2d at 133. Viewing the facts most favorable to Burns, the Court cannot find that DPR actively did anything to mislead or misinform Burns, and therefore will not apply equitable estoppel.

### b. Gaskins failed to exhaust her administrative remedies and did not produce sufficient evidence for equitable avoidance or vicarious exhaustion

Gaskins, whose DPR employment was terminated in March 2005, never filed an EEOC complaint before joining this lawsuit. She asks the Court to similarly apply the doctrine of equitable estoppel, or alternatively to permit her to "piggyback" on Byrd's EEOC filing under the "single filing exception."

Although the D.C. Circuit has not squarely addressed the issue of whether equitable estoppel is available to plaintiffs who *never* file a complaint with the EEOC, a court in this district very recently concluded that it is. *Dahlman v. American Ass'n of Retried Persons*, ---F. Supp. 2d ---, 2011 WL 2382966 at *5 (June 13, 2011 D.D.C.) (finding that a Court may consider equitable excuses even when a plaintiff failed to file any complaint with the EEOC). This Court need not address the question, however, because the outcome will be the same: Gaskins cannot invoke equitable estoppel. Following the same reasoning outlined above, DPR did not engage in any affirmative *action* or misconduct to mislead Gaskins as to her legal rights. Indeed, when Gaskins called Interim Director Stanley and threatened to take legal action days after her termination, his response was to "go get a lawyer." Gaskins Dep. [121-19] at 74:12–20. Gaskins' claims that DPR prevented her from pursuing litigation, or lulled her into a state of inaction by failing to instruct her of her legal rights, are thus unpersuasive.

As explained above, the ordinary rule requires a plaintiff to individually lodge a timely complaint with the EEOC or offer a basis for an equitable excuse for the time limit. However, the "single-filing exception," aka "vicarious exhaustion," allows a non-filing party to join the lawsuit of a filing party if she possesses claims against the same defendant "so similar to those asserted by the original plaintiff that no purpose would be served by requiring them to file

independent charges." *Brooks*, 606 F.3d at 807 (citing *Foster*, 655 F.2d at 1323). The similarity of two claims is evaluated for whether the original filing performs the principal notice function of the EEOC filing requirement, thus rendering a second filing by a similarly situated plaintiff unnecessary and wasteful. *See Moore*, 424 F. Supp. 2d at 150. An original claim must: (1) put the employer-defendant on notice of all charges by the similarly situated plaintiff, and (2) provide the employer and the EEOC with an opportunity for administrative consolidation and resolution. *Foster*, 655 F.2d at 1322 (applying the single-filing exception where similarly situated litigants alleged the same discriminatory treatment as the basis of their claims, making two EEOC charges redundant). In sum, where complaints differ such that there is a real possibility that one claim may be settled administratively while the other may be resolved only in the courts, plaintiffs must file separate EEOC charges. *See, e.g.*, *Cook v. Boorstin*, 763 F.2d 1462, 1466 (D.C. Cir. 1985) (allowing vicarious exhaustion where there was no possibility that only one claim could be settled administratively because both plaintiffs needed to demonstrate the same pattern of racial discrimination in promotion and advancement to prove their allegations).

Gaskins and Byrd's complaints are not sufficiently similar to support the single-filing exception. They allege that they are "victims of the same discriminatory practices" because (1) both woman were harassed through "repeated instances of forced sexual touching and intercourse upon threats of termination" inflicted by the same supervisor; (2) the harassment occurred at the approximate same time; and (3) both were unlawfully terminated in retaliation for reporting and resisting the harassment. Because Gaskins was named as a potential victim in the Lerner Report—which was later submitted to the EEOC in relation to Byrd's claims on June 22, 2006—Gaskins contends that DPR was on notice of her forthcoming complaints of sexual

harassment and knew that it was subject to potential liability. But the Court agrees with the District's argument that the EEOC charge and the Lerner Report are not precise enough to serve the purposes of vicarious exhaustion because they did not put the District on notice of the extent of Gaskins' allegations or necessarily implicate DPR's liability.

The Lerner Report lists Gaskins as a "witness to be interviewed" because she was a former DPR employee "who complained about harassment from Mr. Thompson." Preliminary Lerner Report, [121-28]. The report does not elaborate on the nature or severity of Gaskins' complaints, but merely reiterates what Gaskins allegedly told Byrd: that she "was fired by Thompson" after he "kissed her on the mouth." *Id.* These statements would not put DPR on notice of the pervasive nature of the allegations Gaskins now asserts: a long-term pattern of repetitive forced sexual acts.[21] Nor would the Lerner Report or Byrd's EEOC charge have put DPR on notice of Gaskins' potential retaliation claims. Furthermore, because the challenged conduct stems from the tortious acts of one employee, the existence of respondeat superior for each claim may differ, proving consolidation impossible.

Although some facts are overlapping, an investigation into Gaskins' complaint requires a different factual inquiry and testimony from different witnesses. Unlike previous applications of the single-filing exception, in which additional investigations were redundant because the employees could only prove their allegations by demonstrating the same pattern of discrimination, Byrd and Gaskins must prove different sets of facts in order to prevail on their specific Title VII claims, and, more specifically, to establish the District's liability. *Howard*, 571 F. Supp. 2d at 159 (D.D.C. 2008) (citing *Cook v. Boorstin*, 763 F.2d 1462, 1466 (D.C. Cir. 1985)). Courts have typically applied the single-filing exception where a systematic pattern of

---

[21] Nor would her complaints to Gripper or Richardson have put DPR on notice because neither party further disclosed her allegations beyond their private conversations.

discrimination was an integral part of an employer's practices and multiple plaintiffs' claims arose from one discriminatory mechanism. *See, e.g.*, *Moore,* 424 F. Supp. 2d at 150 (finding that a plaintiff had vicariously exhausted his administrative requirement for charges alleging discriminatory transfers, assignments, and disciplinary policies through the original plaintiffs' non-promotion class complaint). Simply put, an investigation into Byrd's complaint does not *necessarily* implicate Gaskins' Title VII hostile work environment and retaliation claims.

While the Court is reluctant to reward employers that are delinquent in the responsibilities charged to them by the EEOC, an individual plaintiff's responsibility to act with due diligence and establish her pleading burden cannot be excused, nor can the Court ignore the purposeful design of administrative requirements and the governing law. Accordingly, Burns and Gaskins may not pursue Title VII suits against DPR. As their DCHRA claims were dismissed earlier in this litigation, the following discussion of Title VII and DCHRA applies only to Byrd and Jean-Baptiste.

> **2. Summary judgment on Byrd's hostile work environment claims is not appropriate because genuine factual disputes exist between the parties**

Byrd argues that the Court should grant judgment in her favor with respect to her hostile work environment claims, or alternatively render judgment barring the District from asserting the *Faragher*/*Ellerth* affirmative defense to vicarious liability at trial.

The scope of Title VII protections is not limited to preventing specific discriminatory employment decisions with "tangible" consequences. It also prohibits an employer from subjecting its employees to discriminatory hostile or abusive work environments. *Jones v. GlaxoSmithKline, LLC,* 755 F. Supp. 2d 138, 149 (D.D.C. 2010). It is unlawful for a workplace to be permeated with "discriminatory intimidation, ridicule and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment." *Harris*, 510 U.S. 17, 21 (1993) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65−67 (1986)). To be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive; that is, both a reasonable person and the victim herself would find the workplace hostile or abusive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 12, 21−22 (1993)). Whether an environment is sufficiently hostile "can be determined only by looking at all the circumstances," including the frequency and severity of discriminatory conduct; whether the conduct is physically threatening or humiliating, or consists of a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23. In sum, the conduct must be so extreme as to amount to a change in the terms and conditions of employment. *Faragher*, 524 U.S. at 788.

To establish a prima facie hostile work environment claim against her employer, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was on the basis of membership in a protected class; (4) the harassment unreasonably interfered with the plaintiff's work performance and created an intimidating, hostile, or offensive working environment; and (5) the existence of respondeat superior liability. *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122−23 (D.C. Cir. 2002).

If undisputed, Byrd's description of Thompson's conduct during her employment at the DPR easily satisfies the first four elements of a hostile work environment claim. First, as a woman, Byrd is a member of a protected class. *See Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97 (D.D.C. 2007). Second, according to Byrd, Thompson engaged in unwelcome harassment at least once a day. She alleges that he constantly touched her breasts or buttocks, made comments sexual in nature, frequently requested sex or oral sex, and forcibly removed her

clothing if she did not comply with his demands. Third, the severity of her allegations is plainly sufficient to rise to the level of pervasive harassment required to alter the terms or conditions of employment. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 60, 67 (1986) (finding that the plaintiff's allegations that her supervisor repeatedly demanded sexual favors during and after business hours, fondled her in front of other employees, and forcibly raped her on several occasions were more than sufficiently severe to qualify as an actionable hostile work environment claim). Finally, when "challenged conduct typically involves explicit or implicit proposals of sexual activity" between members of the opposite sex, "it is reasonable to assume those proposals would not have been made to someone of the same sex" and therefore are made on the basis of sex. *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

Consequently, the parties' dispute boils down to two issues. First, because the parties' factual assertions sharply conflict in every important aspect regarding the extent and nature of Thompson and Byrd's relationship, questions of material fact undoubtedly exist—thus rendering summary judgment inappropriate. Byrd nevertheless argues that her claim must prevail because the District has failed to meet its burden to offer admissible evidence in support of its opposition. The parties' second dispute arises from questions involving the District's vicarious liability for the tortious acts of its managerial employee.

a.      **Thompson's Lerner Transcript may be considered in deciding whether summary judgment is appropriate, and therefore a genuine issue of material fact exists**

The District offers conflicting and illogical assertions to oppose Byrd's claims. It simultaneously refutes the incidents Byrd recounts by citing Thompson's denial of ever having had any sexual contact with her, *see* Thompson Lerner Transcript, [121-16] at 19–22, while also arguing that a jury may not find the harassment unwelcome because Byrd and Thompson had a

consensual sexual relationship. *See* Def. Opp'n PMSJ, ECF No. 127. The District's arguments rely almost exclusively on statements Thompson made on May 23, 2005 during the course of a pre-litigation investigation into Byrd's claims.[22] Determining the nature of Byrd and Thompson's relationship would normally require credibility determinations appropriately resolved by a jury. *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). Byrd, however, argues that the transcript of Thompson's interview is inadmissible hearsay and therefore may not be considered on summary judgment.[23] *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *see also Gleklen v. Democratic Congressional Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (finding that inadmissible hearsay cannot defeat summary judgment). But Byrd's argument regarding the admissibility of the actual *document* itself is irrelevant at this time; the only question before the Court is whether its factual content may be considered.

At the summary judgment stage, a non-movant is not required to produce evidence in a form that is admissible, but the evidence must be capable of being converted into admissible evidence at trial. *Gleklen*, 199 F.3d at 1369; *see also America v. Mills*, 654 F. Supp. 2d 28, 34 (D.D.C. 2009) (finding that "if it is possible to convert evidence into a form that would be admissible at trial," the court may consider it for summary judgment). Thompson's statements

---

[22] Other evidence the District submits does not establish the existence of any genuine dispute of fact as to Byrd's account of the facts or the nature of her relationship with Thompson. Roberts has no personal knowledge of Thompson and Byrd's sexual contact, and therefore her testimony about other employees' opinions or her own "feeling" that Thompson and Byrd had a consensual relationship does not create a factual dispute. Nor does other testimony by DPR employees who did not personally witness any harassment cast doubt on its occurrence. Finally, Byrd's admission that she accepted money from Thompson, by itself, does not create an issue of fact as to whether the harassment was unwelcome.

[23] Byrd argues that the transcript is hearsay because: (1) it is a statement by an out-of-court declarant (Thompson); or alternatively (2) it is hearsay within hearsay because it is a statement by an out-of-court declarant (the person who created the transcript) accounting the personal knowledge of an out-of-court declarant; and 3) no hearsay exceptions apply.

contained in the transcript, which were based on his own personal knowledge, can be converted if he testifies to those matters at trial. *See Richards v. Option One Mortgage*, 2009 WL 2751831, at *1 n.3 (D.D.C. 2009) (explaining that hearsay statements may be converted into admissible evidence if a witness with personal knowledge can testify to them at trial). Presently, there is no reason for the Court to assume that Thompson cannot and will not testify to the disputed facts at trial by virtue of a Trial Subpoena—issued by the authority of the D.C. District Court and served with the force of the United States Marshal Service. Fed. R. Civ. P. 45. In light of the foregoing, a genuine dispute of fact exists as to Byrd's hostile work environment claims and the Court must deny her motion for summary judgment.

### b. The District is not entitled to assert the Faragher/Ellerth defense

Byrd alternatively requests that the Court bar the District from utilizing the *Faragher-Ellerth* affirmative defense to vicarious municipal liability at trial. The Supreme Court has delineated two categories of hostile work environment claims creating employer liability: (1) harassment culminating in a tangible employment action for which employers are strictly liable, and (2) harassment occurring in the absence of tangible employment actions to which employers may assert an affirmative defense. *Lutkewitte v. Gonzales,* 436 F.3d 248, 250–51 (D.C. Cir. 2006) (internal citations omitted); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998). An employer may dispute liability where a victimized employee alleges an actionable hostile environment created by a supervisor with immediate or successively higher authority over the employee. *Faragher*, 524 U.S. 775 at 807–08; *accord Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65 (1998). The affirmative defense involves the reasonableness of both the employer and employee's conduct by requiring two necessary elements: that (a) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that (b)

"the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* To avoid liability for the tortious acts of its supervisors, an employer must prove *both* prongs by a preponderance of the evidence. *Jones v. Dist. of Columbia*, 646 F. Supp. 2d 42, 49 (D.D.C. 2009); *accord Roebuck v. Washington*, 408 F.3d 790, 792 (D.C. Cir. 2005).

Like the facts in *Faragher*, the record here cannot support a finding that DPR exercised reasonable care to prevent or correct the harassing behavior. *Faragher*, 524 U.S. 775 at 807–09. The employer in *Faragher* was foreclosed from raising an affirmative defense when it failed to disseminate its anti-harassment policy to the relevant employees, monitor the conduct of the harassing supervisors, or provide any assurances that harassing supervisors could be bypassed in registering complaints. *Id.* at 808. The *Faragher* court explained that an employer does not necessarily have to prove it promulgated an anti-harassment policy and complaint procedure to invoke an affirmative defense. *Id.* But in certain factual circumstances, the specific *need* for a policy may be significant in considering the employer's use of reasonable care. *Id.* The *Faragher* court found that unlike employers of a smaller workforce, officials "responsible for city-wide operations" could not have reasonably concluded that precautions against hostile environments would be effective without actively communicating formal procedures to employees at its many sprawling locations. *Id.* at 808–09. Similarly, this Court finds that DPR, due to its size and structure, needed to systematically communicate complaint procedures to reasonably prevent harassment.

The District fails to prove that it effectively supplied its Maintenance Division employees with information regarding its procedures. *See* Pls.' Mot. Partial Summ. J., ECF No. 121-38–121-43, Ex. 36–41. Further, it fails to affirmatively identify what paper policy was actually

in effect prior to 2005.  *Id.*  Testimony of DPR employees and management directly contradict DPR's assertions that information regarding anti-harassment policies was ever effectively distributed, despite DPR's suggestions that its employees "should have received training" or that its feeble production of polices that "should have been in effect."  Numerous DPR administrators—including former EEOC Counselor Terrence Reddick, current Human Resources Director Richelle Marshall, former Human Resources Department Head Arnita Bonner, and former DPR Directors Neil Stanley and Neil Albert—do not recall ever having seen DPR's Sexual Harassment and Retaliation Guidelines for Mangers and Supervisors or DPR's Sexual Harassment Policies and Procedures Manual.  Pls.' Mot. Partial Summ. J., ECF No. [121-38]–[121-42], Ex. 36–40.  No administrative official could confirm at his or her deposition that the submitted 2002 DPR Sexual Harassment Policy was in effect or ever distributed; indeed, neither Stanley, Reddick, nor Marshall had ever seen the document.  Pls.' Mot. Partial Summ. J., ECF No. 121-43, Ex. 41.  In addition to plaintiffs, several other DPR employees testified that they received no information or training on sexual harassment until after Byrd's 2005 complaints.  *See* Roberts Dep.; Gwathmey Dep.; Kemper Dep.  As "proof" of its reasonableness, the District asserts that DPR employees should have been told during orientation that they had access to sexual harassment guidelines at DPR's Human Resources office, but it offers no evidence proving that its employees actually received orientation.

DPR's inadequate promulgation of its policies is further evidenced by its supervisors' repeated, inappropriate responses to complaints of harassment.  Roberts, Byrd's direct supervisor, testified that during that the period she supervised Byrd, she did not believe it was her responsibility to handle complaints of harassment or notify anyone if complaints were made to her—directly contradicting the procedure in DPR's Sexual Harassment and Retaliation

Guidelines for Managers. *See* Def.'s Managerial Policy [121-38]. Roberts later acknowledged that she realized this was "something [she] should have done" after receiving harassment training at DPR following Byrd's complaints. Roberts Dep., [121-10] at 12–13. The record shows that other employees had similarly inappropriate reactions to Burns, Gaskins, and Kemper's complaints of harassment. If an anti-harassment policy had actually been disseminated, it is unlikely that ignorance of company procedures would have been as rampant throughout the department.

Even when faced with a specific need for a formal complaint procedure within the Maintenance Division, DPR failed to actively correct inadequacies in the dissemination of information to employees. Although the District disputes that any "formal complaint" was ever filed against Thompson prior to Byrd's filing, the record shows that several of DPR's high-ranking managers were aware of previous accusations of sexual harassment. Stanley and Reddick both testified that they were aware of rumors of misconduct within the Maintenance Division. Khabo stated that he and Albert spoke with Thompson in 2002 regarding the "cloud of complaints" of sexual harassment against him. Plaintiffs, along with other female employees, testify that they personally informed various DPR directors of Thompson's behavior on several occasions. DPR's own response to the EEOC's questions about prior complaints included admissions that it was "aware that four employees of the agency orally complained that they were the subject of sexual harassment," listing employees "Tonya Kemper, Annette Burns, Demera Gaskins and Katrina Williams." Pls.' Mot. Partial Summ. J., ECF No. 121-17, Ex. 15 ("DPR's Response to DCHRO's Request for Information"). Despite numerous rumors, DPR failed to initiate an investigation, circulate any complaint procedures, or monitor the Maintenance Division—allowing Thompson's virtually unchecked authority over his

subordinates to continue. Under these circumstances, a jury could not conclude that DPR acted with reasonable caution to prevent or correct ongoing harassment within the department.

Turning to the second prong of the *Faragher-Ellerth* defense, a finding that Byrd failed to mitigate her damages is not necessary to defeat DPR's liability defense. Nevertheless, in light of the above, a reasonable jury could not find that Byrd failed to utilize corrective or preventive opportunities—because none were provided. The District argues that a reasonable person in Byrd's circumstances would have come forward earlier to mitigate her damages instead of allowing her injuries to exacerbate. But absent a complaint procedure detailing how to make a claim and assuring job security if she came forward, Byrd did not act unreasonably. *See Faragher*, 524 U.S. 775 at 809. She did not have an adequate opportunity to obtain assistance by reporting to supervisors like Roberts, because they too were unaware of complaint procedures. In light of the disparity in bargaining power between Byrd and Thompson—who wielded the almost exclusive power to renew or terminate her term appointment—any delays in reporting harassment were reasonable under the circumstances.

Viewing the record in the light most favorable to defendant, the Court finds that the District can be held vicariously liable for Thompson's alleged harassment of Byrd and consequently may not avail itself of the *Faragher-Ellerth* defense at trial.

### 3. Summary judgment on Byrd and Jean-Baptiste's retaliation claims is not appropriate because the District fails to actually dispute plaintiffs' allegations of discrimination, and because genuine factual disputes exist with respect to DPR's rejection of Jean-Baptiste's application for year-round employment

Title VII's anti-retaliation provision prohibits employers from retaliating against any employee for asserting her statutorily protected right to speak out against discrimination. 42 U.S.C. § 2000e-(3)(a) ("It shall be an unlawful employment practice for an employer to

discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."); *Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008); *Lathram v. Snow*, 336 F.3d 1085 (D.C. Cir. 2003). To prove retaliation, a plaintiff must establish that (1) she complained or threatened to complain of sexual discrimination, (2) she suffered a materially adverse action by her employer, and (3) a causal connection links the two. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *Baloch v. Kempthrone*, 55 F.3d 1191, 1198 (D.C. Cir. 2008). In the retaliation context, a "materially adverse" action must be both objectively and subjectively harmful, and capable of "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Close "temporal proximity" between the adverse action and the employer's awareness of the protected activity is sufficient to show a causal link. *Clark County Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001). Byrd and Jean-Baptiste have both established *prima facie* cases of retaliation. DPR was aware that both women had complained of sexual harassment to either their supervisors or to the EEOC, and their employment with DPR came to an end shortly thereafter.[24]

### a. Plaintiffs adequately set forth an adverse employment action that can serve as a basis for proper retaliation claims.

Byrd and Jean-Baptiste both claim that DPR did not renew or extend their employment term as a result of their respective complaints of sexual discrimination. In moving for summary

---

[24] Byrd filed with the EEOC in April 2005 and was not terminated until December 2005. She argues the lapse of only three weeks between her testimony before the D.C. Council and her termination at DPR establishes a causal inference of discrimination. But Byrd's employment was for a predetermined term of thirteen months that was set to expire on December 31, 2005, and thus the short span of time between these two events does not necessarily imply discriminatory motives. Nevertheless, "there is no hard and fast rule that any specified amount of time is too removed for an inference of causation," and where a "defendant retaliates at the first opportunity that is presented, a plaintiff will not be foreclosed from making out a prima facie case despite a substantial gap in time." *Cones v. Shalala,* 199 F.3d 512, 521 (D.C. Cir. 2000) (citing *Parado-Kronemann v. Jackson*, 541 F. Supp. 2d 210, 218 (D.D.C. 2008)). Byrd's termination was the first time her term was necessarily under review since her initial complaints in April. The Court thus finds that Byrd has shown the causal link required to establish a *prima facie* case.

judgment, the District argues that the evidentiary record cannot support a charge of retaliation because, as seasonal and term employees, plaintiffs' employment was predetermined to expire at a certain time with no guarantees of further employment. According to the District, because the plaintiffs' employment ended on prefixed terms, no jury could reasonably find that its employment actions were made for discriminatory reasons. The Court is not persuaded. As an initial matter, the District's argument that Byrd and Jean-Baptiste's term positions "naturally expired," or were "necessarily terminated or not renewed," is not an adequate response to plaintiffs' allegations and evidence demonstrating that DPR did not *continue* or *renew* their employment because they made accusations of sexual harassment. Def. Reply DMSJ, [140] at 10. Failure to hire, renew, or promote can serve as an actionable basis for a Title VII retaliation claim. *See, e.g.*, *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004); *Mitchell v. Baldrige*, 759 F.2d 80, 86 n.5 (D.C. Cir. 1985).

Moreover, the Court must reject the District's position as a matter of policy. Under Title VII, anti-retaliation provisions prevent employer interference with remedial mechanisms available to employees in the workplace by prohibiting employer actions by employers that are likely to deter victims of discrimination from complaining about their working conditions. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. Were the Court to agree with the District, temporary employees who are subject to contract renewal would be discouraged from speaking out against unlawful acts occurring in the workplace. Because Title VII protects these employees, the Court cannot find that the "natural expiration" of term employment, standing alone, precludes a retaliation claim, as such a conclusion would undermine Title VII's establishment of safeguards to eliminate discrimination in the workplace. Such a holding would consequently allow employers to insulate themselves from liability by merely hiring employees

on a term-basis and allowing their employment to lapse whenever complaints of discrimination are lodged.

The District's legal argument does raise one question: In the case of a term employee, what defenses are available to an employer when the employee alleges that her employment term lapsed for purposeful discriminatory or retaliatory reasons?  In the Title VII context, the ultimate burden of proving employment actions are retaliatory lies with the plaintiff.  At the same time, to sufficiently oppose a claim of retaliation, a defendant-employer must produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Defendant's burden is one of production; it need not persuade the Court that it was actually motivated by the given reasons, *id.*, but it must articulate specific reasons for its actions that "*if believed by the trier of fact*, could support a finding that unlawful discrimination was not the cause of the employment action," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citing *Burdine*, 450 U.S. at 254–55, n.8).

The failure to renew an employment term is similar to the failure to hire or failure to promote.  In these contexts, defendants that are able to articulate a legitimate, non-discriminatory explanation for their actions can sufficiently defeat a presumption of discrimination.  *See, e.g*., *Gaujacq v. EDF, Inc*., 601 F.3d 565, 577 (D.C. Cir. 2010) (explaining the employer properly disputed allegations of retaliation by claiming the plaintiff's transfer to France after her contract expired was because she refused to cooperate with a supervisor and employer wanted to use her expertise on another project); *Halcomb v. Office of The Senate Sergeant-at-Arms of U.S. Senate*, 563 F. Supp. 2d 228, 249 (D.D.C. 2008) (finding an employer offered a sufficient explanation for an employee's non-selection by asserting that she lacked a degree in engineering); *Than v.*

*Radio Free Asia*, 496 F. Supp. 2d 38, 46–47 (D.D.C. 2007) (finding an employer's assertion that it based its hiring decision on answers a candidate gave during an interview was both reasonable and nondiscriminatory, and was thus sufficient to meet an employer's burden of offering a legitimate reason for not hiring the plaintiff); *Fischbach v. Dist. of Columbia Dept. of Corr.*, 86 F.3d 1180, 1182 (D.C. Cir. 1996) (concluding an employer's explanation for not hiring the plaintiff over another applicant was based on both candidates' interviews); *see generally Bernanke*, 493 F. Supp. 2d at 32 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (concluding the defendant rebutted the plaintiff's *prima facie* case by identifying non-discriminatory factors that motivated its decision)).

In this instance, both Byrd and Jean-Baptiste have presented sufficient evidence to state a *prima facie* case of retaliation. With respect to Byrd, the District has no response for the end of Byrd's tenure with DPR other then to point the Court to the expiration of her term. As set forth above, this is insufficient. Accordingly, the Court will deny defendant's motion for summary judgment with respect to Byrd's retaliation claims. With respect to Jean-Baptiste, the District offers an independent explanation as to why her employment with DPR ended, which the Court now addresses.

> **b.    Jean-Baptiste adequately establishes a genuine issue of material fact with respect to the District's additional reasons for taking an adverse action against her**

In addition to arguing that Jean-Baptiste's position naturally concluded, the District argues that the reason her application for year-round hire was rejected was because she failed a swim assessment. When evaluating a motion for summary judgment on a retaliation claim based entirely on circumstantial evidence—where there is no direct proof of discrimination—the Court considers a plaintiff's claims under the traditional *McDonnell Douglas* standard. *See McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under this burden-shifting framework, a plaintiff must first establish a *prima facie* case of retaliation; the defendant is then required to rebut the presumption of unlawful retaliation by offering a non-discriminatory reason for its actions; and finally, the plaintiff is provided an opportunity to prove the inadequacy of the defendant's rebuttal by proving that the stated basis is not the actual reason but merely pretext for discrimination.  *Id.*

Recently, the D.C. Circuit distilled the initial analysis of retaliation claims, explaining that where a defendant has already articulated a legitimate reason for the challenged action, the court need not determine if the plaintiff makes out a *prima facie* case.[25]  *See Bernanke*, 557 F.3d at 678 (citing *Brady*, 520 F.3d at 494).  Under those circumstances, the court need only resolve "the ultimate factual issue"—whether the employee produced sufficient evidence for a reasonable jury to find the employer's justifications for the challenged action are merely pretext for underlying, unlawful discrimination.  *Id.*  To make this determination, a court evaluates whether a jury could infer discrimination or retaliation from the plaintiff's *prima facie* case, any evidence the plaintiff presents to attack the employers' explanation, and any other evidence of retaliation available to the plaintiff.  *Drewrey v. Clinton*, 763 F. Supp. 2d 54, 60–61 (D.D.C. 2011) (citing *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992–93 (D.C. Cir. 2002)).  To avoid summary judgment, the plaintiff is not required to present evidence in each of these categories; instead, the court assesses the plaintiff's challenge to the employer's explanation by looking at the totality of the circumstances.  *Id*. (citing *Aka v. Wash. Hosp. Ctr*., 156 F.3d 1284, 1289–91 (D.C. Cir. 1998)).  Strength of a plaintiff's *prima facie* case may be a significant factor

[25] The *Brady* Court observed that by the time the district court considerers an employer's motion for summary judgment, the employer ordinarily has asserted a legitimate non-discriminatory reason for the challenged decision and therefore has already done everything that would be required of it had the plaintiff established a *prima facie* case. 520 F.3d at 494.

in her attempt to rebut the defendant's legitimate non-retaliatory reason for an adverse action. *Light v. Mills*, 697 F. Supp. 2d 118, 122 (D.D.C. 2010) (citing *Aka*, 156 F.3d at 1289 n. 4) ("[A] *prima facie* case that strongly suggests intentional discrimination may be enough by itself to survive summary judgment.")) The existence of temporal proximity alone, however, is insufficient to show retaliatory intent; additional proof is required to take the inferential step that the employer's decision was retaliatory. *Porter v. Fulgham*, 601 F. Supp. 2d 205, 229 (D.D.C. 2009) (citing *Patterson v. Johnson*, 505 F.3d 1296, 1299–1301 (D.C. Cir. 2007)).

In short, if the plaintiff shows that "a reasonable jury could conclude from all the evidence that the adverse employment action was made for a discriminatory reason," an issue of fact exists and a "motion for summary judgment should be denied." *Vilsack*, 718 F. Supp. 2d at 117 (citing *Lathram*, 336 F.3d at 1088).

In this instance, the District asserts that Jean-Baptiste "was not hired for a permanent position due to failing her swimming assessment, not due to any retaliatory motive." Def. Reply DMSJ, [140] at 15. The only remaining issue before the Court is whether Jean-Baptiste offered enough evidence to create a question of fact as to whether DPR's explanation is merely pretext to hide unlawful, discriminatory hiring practices.

Jean-Baptiste's notified DPR management of her intent to pursue her legal rights only days before she was compelled to complete a swim assessment as a contingency of her future DPR employment. According to DPR, the negative results of this assessment led to the rejection of her application for permanent hire. In addition to showing a very close temporal proximity between her complaints and DPR's adverse employment action, Jean-Baptiste offers sufficient additional evidence to attack DPR's justifications as pretextual. For example, the record indicates that she previously passed a swim assessment during her initial hire and received

extensive lifeguarding and water safety certifications. These results cast doubt on the legitimacy of DPR's assertions. Moreover, DPR never mentioned Jean-Baptiste's allegedly unsatisfactory swimming skills until after her complaints; indeed, Deputy Director Roslyn Johnson's letter to Jean-Baptiste on September 29, 2006, indicates that her requests for permanent employment were to be evaluated based on funding and departmental resources, not on her swimming qualifications. Jean-Baptiste and DPR Correspondence, [132-15]. Specifically, DPR was to determine whether the budget would allow additional permanent staff during the two-week grace period Jean-Baptiste was granted past the expiration of her summer term. Finally, DPR does not provide any documentation or record of the failed assessment and does not dispute Jean-Baptiste's accusations that the substance of the test departed from normal practice. A reasonable jury could infer that DPR's failed-swim-assessment-excuse for not hiring Jean-Baptiste was a guise to cover up its true retaliatory motives. The Court will therefore deny the District's motion for summary judgment with respect to Jean-Baptiste's retaliation claims.

### B.     District of Columbia Whistleblower Act

The DCWPA prohibits certain employment actions and other retaliatory behavior in response to an employee's attempts to speak out against unlawful activity she witnesses or experiences. To establish a *prima facie* case under the DCWPA, a plaintiff must allege that (1) she made a protected disclosure, (2) her employer or supervisor retaliated by taking, or threatening to take, prohibited personnel actions against her, and (3) her protected disclosure was a contributing factor to the prohibited employment action. A protected disclosure is defined as:

> [A]ny disclosure of information . . . by an employee to a supervisor or a public body that the employee reasonably believes evidences: (A) Gross mismanagement; (B) Gross misuse or waste of public resources or funds; (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract; (D) A violation of federal, state, or local law . .

. which is not of a merely technical or minimal nature; or (E) A substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52 (a)(6)(D).  The District moves for summary judgment on Byrd and Jean-Baptiste's claims; its efforts however, appear half-hearted.  It initially argues that the plaintiffs made no protected disclosures that fall under one of the five categories enumerated above, and even if they did, the plaintiffs' statements that sexual harassment within the department was "common knowledge" preclude their complaints from being protected because "a disclosure of information that is publically known is not a disclosure under the WPA."  DMSJ [123] (citing *Wilburn v. Dist. of Columbia*, 957 A.2d 921, 926 (D.C. App. 2008)).  Both arguments utterly fail to persuade the Court.

Byrd's EEOC filing and testimony before the D.C. Council and Jean-Baptiste's letters to DPR management—both alleging harassment and discrimination in violation of federal and state law—clearly fall under subsection (6)(D), as these disclosures were plainly based on plaintiffs' reasonable belief that laws were violated.  D.C. Code § 1-615.52 (a)(6)(D).  As to its second assertion, the District undercuts its own argument by noting that it will not "make any concessions regarding the purported 'common knowledge' of Thompson's allege harassment."  Def. Reply DMSJ, [140] at 38 n.2.  Because the District will not assume the position that the plaintiffs' statements were public knowledge, the Court will not address that argument.

After seemingly abandoning that line of reasoning in its Reply brief, the District further asserts that plaintiffs cannot meet the third element of their *prima facie* cases because their employment with DPR "did not end as a result of any of their purported complaints or alleged protected activity," relying exclusively on its previous analysis of Title VII retaliation Def. Reply DMSJ, [140] at 38.  As demonstrated above, issues of material fact exist as to whether they were subject to adverse employment actions as a consequence of their complaints of discrimination.

*Id.* Byrd and Jean-Baptiste both offered sufficient evidence that a reasonable jury could find their termination was not motivated by the reasons DPR offered, but was in fact reactive to their charges of harassment. *See* discussion *supra* Part IV.A.iii.a–c. The Court will therefore deny the District's motion for summary judgment with respect to all DCWPA claims.

### C.        42 U.S.C. §1983

Section 1983 of the Civil Rights Acts of 1871 establishes liability for "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Under Section 1983, a municipality is liable only for those constitutional torts arising from action pursuant to official municipal policy. *Triplett v. Dist. of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997). The District's liability is contingent on a two-step inquiry to determine: (1) whether plaintiffs establish a predicate constitutional violation, and if so, (2) whether a custom or policy of the District of Columbia caused the injury. *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). The plaintiffs allege the District is liable for violating their First and Fifth Amendment rights. Without addressing the merits of the parties' arguments with respect to the first prong of Section 1983 analysis, the Court finds that no policy or custom of the District of Columbia acted as a "moving force" behind the purported constitutional violations. *Baker*, 326 F.3d at 1306; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) ("[T]he touchstone of the § 1983 action against a government body is an allegation that the official policy is responsible for a deprivation of rights protected by the Constitution.").

There are several ways a plaintiff can demonstrate that the District of Columbia is liable via Section 1983. A plaintiff can show municipal practices violated her constitutional rights through (1) "the explicit setting of a policy by the government," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinated that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate' indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306 (internal citations omitted).

Plaintiffs suggest that the District should be held accountable for their injuries because DPR management knowingly ignored ongoing sexual harassment and discrimination, allowing such conduct to become a "custom" of the agency. They further argue that the need for sexual harassment training was so obvious that the District's failure to respond to this need amounts to "deliberate indifference" to the risk of further injuries. Plaintiffs' arguments fail because no final policy maker can be identified among the relevant key players, and the conduct at issue was not so pervasive that the *city itself* should have been aware of its occurrence. *See Banks v. Dist. of Columbia*, 377 F. Supp. 2d 85, 91 (D.D.C. 2005); *Warren v. Dist. of Columbia*, 353 F.3d 36, 29 (D.D.C. 2004).

Under Section 1983, a municipality is not liable under principles of respondeat superior, but is only responsible for the discretionary acts of a municipal employee who possesses policymaking authority. *Triplett*, 108 F.3d at 1453 (citing *Monell*, 436 U.S. at 691). "Final policymaking authority" for a municipality is a matter of state or local law. *Id.* (citing *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989)). Plaintiffs contend that Directors Stanley and Albert are final policymakers for DPR, and therefore their actions or inactions set

employment procedures for the department.  In support of their argument, plaintiffs cite cases finding that the Director of the D.C. Department of Mental Health and the Director of the D.C. Department of Corrections are final policymakers because they are "responsible for 'the general direction and supervision' of the department."  *Banks*, 377 F. Supp. 2d at 91 (citing *Triplett*, 108 F.3d at 1453).  But *Banks* and *Triplett* are distinguishable by a crucial factor: both point to specific provisions in the D.C. Code granting the director authority to promulgate rules for the administration of his respective department with regard to the conduct at issue.  *See Banks*, 377 F. Supp. 2d at 91 (citing D.C. Code § 7-1131.05 (2001)); *Triplett*, 108 F.3d at 1453 (citing D.C. Code § 24-442 (1981)).  These cases crystallize the rule that authority to make municipal policy is the authority to make *final* policy specific to the tortious conduct. If an official's discretionary decisions are constrained by policies not of that official's making, then those policies—rather then the official's departure from them—are the act of the municipality. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *see also Maniaci v. Georgetown University*, 510 F. Supp. 2d 50, 60 (D.D.C. 2007).

Plaintiffs have failed to identify any portion of the D.C. Code specifically granting authority to the DPR director to promulgate administrative rules or anti-harassment policies and procedures similar to those in *Banks* or *Triplett*.  The D.C. City Council and the Mayor set anti-discriminatory policy and procedure for the entire city, requiring new employees to participate in mandatory sexual harassment training and receive copies of relevant laws.  *See* DPR's Response to DCHRO's Request for Information, [121-17] at 2–3.  The individual failures of various DPR directors to sufficiently adhere to the guidelines did not set policy for the municipality.  *Triplett*, 108 F.3d at 1453 (citing *Atchinson v. Dist. of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996).  Absent identification of a member of DPR's management staff who is deemed to be a final

policymaker under D.C. law, the Court cannot find that DPR's actions demonstrated deliberate indifference to plaintiffs' rights or established a "de facto" custom of tolerance of sexual harassment or discriminatory retaliation. Moreover, the conduct that plaintiffs allege is not so widespread or obvious that the District's final policymakers would have otherwise been aware of the deficient training, ongoing harassment, or discriminatory practices at issue. *See Daskalea v. Dist. of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000) (finding the that District and its policymakers were on notice of the conduct at issue from a previous lawsuit and court order to take action to further prevent the conduct). Nor have the plaintiffs offered evidence that the District's final policymakers somehow "endorsed" a policy of sexual harassment. *Triplett*, 108 F.3d at 1453.

Without a policy or practice to rely on, the Court finds no basis to hold the District liable for plaintiffs' alleged constitutional injuries under Section 1983. Therefore, the Court will grant defendant's motion for summary judgment with respect to all Section 1983 claims.

### D. Defendant's Motion to Sever the Remaining Actions

In light of the analysis above, this cumbersome lawsuit has been reduced to Byrd and Jean-Baptiste's DCWPA, DCHRA, and Title VII claims. The Court will next consider defendant's motion to sever the remaining viable actions. The Court may sever actions under Federal Rule of Civil Procedure 21 if the parties have been improperly joined pursuant to the permissive joinder requirements of Federal Rule of Civil Procedure 20(a). Rule 20(a) allows parties to join in one action if the plaintiffs' claims (1) arise out of the same transaction or occurrence or series of transactions or occurrences; and (2) involve a common question of law or fact. Fed. R. Civ. P. 20(a); *Montgomery v. STG Intern., Inc.*, 532 F. Supp. 2d 29, 35 (D.D.C. 2008).

Byrd and Jean-Baptists' hostile work environment and retaliation claims do not implicate a common question of law or fact. The alleged harassment occurred at different times, was committed by different supervisors, at entirely different locations. Plaintiffs argue that both their claims require the Court to examine DPR's administration of sexual harassment policies and complaint procedures to establish a pattern of discrimination. Upon the dismissal of all Section 1983 claims, this argument became moot. Thus, plaintiffs' actions are no longer logically related and severance is appropriate.

## V.    CONCLUSION

Though the Court ultimately finds for the District on a number of issues as a matter of law, it wishes to reiterate its disinclination to reward employers who are careless in preserving the goals that state and federal law prohibiting discrimination are designed to protect. This is particularly true in circumstances where administrators take advantage of those it purports to be helping in particularly vulnerable and socio-economically disadvantaged circumstances.

That said, for the reasons discussed above, the Court will grant the District's motion in part and deny it in part. The Court will grant plaintiffs' alternative argument, barring the District from using the *Faragher-Ellerth* affirmative defense at trial with respect to Byrd only and will deny the motion in all other respects. The Court will also grant defendant's motion to sever, ordering Byrd and Jean-Baptists' claims to be severed into separate actions.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on August 16, 2011.