**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CARMEN JEAN-BAPTISTE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No. 11-1587 (RCL) |
| | ) |
| DISTRICT OF COLUMBIA | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

Following a six-day trial in which the jury returned a verdict on all counts and a $3.5 million compensatory award for plaintiff Carmen Jean-Baptiste, the defendant District of Columbia ("the District") filed this Motion [188] for a New Trial, a New Trial on Damages or, in the Alternative, for Remittitur.  Upon consideration of the motion, Jean-Baptiste's Opposition [194] thereto, the District's Reply [199], the entire record herein, and the applicable law, the Court will DENY the District's motion with respect to its request for a new trial or a new trial on damages and will GRANT the District's motion with respect to its request for remittitur.  Jean-Baptiste will have twenty one days in which to decide whether to accept a reduced award of $350,000, which is the highest amount the jury tolerably could have awarded, or whether to proceed to a new trial on damages.

## I.    BACKGROUND

In late April or early May 2006, plaintiff Jean-Baptiste was hired as a lifeguard by the District of Columbia Department of Parks and Recreation ("DPR").  The parties disputed whether she was hired as a seasonal or year-round employee.  Jean-Baptiste was assigned to the

Takoma Pool and reported to Assistant Pool Manager Rodney Weaver. Jean-Baptiste alleged that Weaver sexually harassed her and that, after she reported the conduct, Weaver and the District retaliated against her and ultimately terminated her employment in mid-October 2006.

Jean-Baptiste sued the District alleging a hostile work environment in violation of Title VII, 42 U.S.C. §2000e et seq., and the District of Columbia Human Rights Act (DCHRA), D.C. Code §2-1401.01 et seq. (Counts 1–2); deliberate indifference to her Fifth Amendment constitutional rights in violation of 42 U.S.C. § 1983 (Count 3); and retaliation in violation of Title VII, the DCHRA, § 1983, and the D.C. Whistleblower Act ("WPA"), D.C. Code §§ 1-615.51 et seq.) (Counts 4–7). Third Am. Compl. 12–17, July 5, 2007, ECF No. 51. This Court granted summary judgment for the District on the § 1983 claims and denied it with respect to the hostile work environment and retaliation claims under Title VII, the DCHRA, and the WPA. Mem. Op., Aug. 16, 2011, ECF No. 161; Order, Aug. 16, 2011, ECF No. 162. Jean-Baptiste's hostile work environment and retaliation claims proceeded to trial in August 2012.[1]

At trial, the jury heard testimony of a "culture of sexual harassment and sexual discrimination at Takoma," of a "boys-gone-wild culture" in the aquatics department, and, with respect to many of the male supervisors above Jean-Baptiste, "a boys club from the top down." Test. of Stacy Mills, Trial Tr. 42–48, Aug. 7, 2012. They also heard testimony about inadequate policies and practices of the District in responding to sexual harassment complaints.

Jean-Baptiste testified that Weaver started to sexually harass her as soon as she began working at Takoma. Specifically she stated that he told her he was interested in her, asked her to go with him to Atlantic City, and crudely and sexually propositioned her, specifically stating that

---

[1] Jean-Baptiste originally joined suit with three other plaintiffs who had been employed by DPR but who suffered alleged harassment and discrimination at the hands of different supervisors at different times and different locations. After motion by the District, the Court severed the actions. *See* Mem. Op., Aug. 16, 2011, ECF No. 161; Order, Aug. 16, 2011, ECF No. 162.

he "wanted to get some of [her] pussy for [his] birthday." Trial Tr. 28–30, Aug. 6, 2012. He would also call her out of the pool while she was swimming and then stand before her with an erection, staring at her body and her vaginal area and licking his lips. *Id.* Finally, she stated that he would touch her hair. *Id.* Jean-Baptiste testified that she told him his conduct made her uncomfortable and asked him to stop, but that the conduct persisted, though for how long is unclear. *Compare* Test. of Carmen Jean-Baptiste, Trial Tr. 29–32, Aug. 6, 2012 (stating that the harassment occurred "daily" and "never stopped") *with* Test. of Carmen Jean-Baptiste, Trial Tr. 154–58, Aug. 6, 2012 (stating that the "earliest date of harm is May 1st, what I said and when he started, and the latest date of harm is June 2006") *and* Def.'s Ex. 88 (stating the same).

Jean-Baptiste verbally complained to Weaver's supervisors, and named six supervisors to whom she had brought her concerns. *Id.* at 35. Each supervisor said that he or she would look into the matter. *Id.* at 35–51. Jean-Baptiste testified that one supervisor, Solomon Robinson, required her to present her complaint in a meeting with Rodney Weaver, such that she had to confront her harasser. Test. of Carmen Jean-Baptiste, Trial Tr. 42–45, Aug. 6, 2012. Jean-Baptiste stated that, during this meeting, Weaver did not deny he had harassed her. Test. of Carmen Jean-Baptiste, Trial Tr. 45, Aug. 6, 2012 ("Rodney didn't say anything, and Solomon in return said, '[S]ince you didn't respond . . . everything she's telling me now is the truth.'"); Test. of Solomon Robinson, Trial Tr. 129, Aug. 7, 2012 ("Rodney [said] 'Carmen, you know we play around.'"). However, Mr. Robinson never investigated the complaint further or referred it to higher level supervisors or the EEO office. *See id.* at 129 ("You don't know DPR very much if you think the policy means [the sexual harassment complaint] goes up [the chain of command]. . . . You give the immediate supervisor an opportunity to address the issues."); *cf.* Pl.'s Ex. 70 ("All managers and supervisors are responsible for . . . ensuring that complaints of [sexual

harassment and retaliation] are promptly forwarded to the EEO Officer or Chief of Human Resources."); Test. of Sean Link, Trial Tr. 107, Aug. 8, 2012 (responding affirmatively when asked whether, "[w]hen a supervisor receives a complaint, according to this, they're supposed to forward the complaint on to higher levels and also EEO, correct?"). Instead, Mr. Robinson "left it in the hands of" Sean Link, Weaver's direct supervisor. *Id.* at 125. Sean Link, however, denied having been aware of the matter and does not appear to have investigated either. Test. of Sean Link, Trial Tr. 88, Aug. 8, 2012 (answering in the affirmative when asked whether it was his testimony that "during Ms. Baptiste's employment [he] never even heard of any complaint of sexual harassment against Rodney Weaver that she had made during her entire summer employment, correct?").

At least two individuals complained to management on Jean-Baptiste's behalf. Stacy Mills, a volunteer who was regularly at the Takoma pool, testified that she complained about sexual harassment by both Rodney Weaver and Robert Ford, another manager at the pool. She stated that Weaver sexually harassed staff and that she complained to Sylvia Gwathmey, the chief shop steward with the union, to deputy director Roslyn Johnson, to an executive of the mayor's office, and to a female attorney in the D.C. Attorney General's office. Trial Tr. 37–45, Aug. 6, 2012.

Additionally, after Jean-Baptiste complained to Margarita Cruz, an assistant manager at the pool, the two had a meeting with Rodney Weaver. Cruz testified that during the meeting, Weaver stroked Jean-Baptiste's hair and told Jean-Baptiste she was beautiful. Trial Tr. 40, Aug. 8, 2012. Later, during a meeting between Cruz, Weaver, Sean Link, and Robert Ford, Cruz reported that Jean-Baptiste had made a sexual harassment complaint to her against Weaver. Cruz testified that Robert Ford said he would not do anything about the complaint. After the

men asked Cruz to leave the meeting, she overheard Robert Ford and Rodney Weaver joking about which one of them would "fuck" Jean-Baptiste first.  Trial Tr., Aug. 8, 2012 at 43–46.[2]

Jean-Baptiste's was not the only complaint of sexual harassment at the Takoma pool during this period.  Weaver had been accused of sexual harassment just one year before Jean-Baptiste was hired, and Jean-Baptiste presented evidence that the District conducted only a superficial "investigation" into the complaint.  *See* Test. of Terrence Reddick, Trial Tr. 58–73, Aug. 7, 2012.  In describing that investigation, former EEO Officer Terrence Reddick testified that he never asked anyone at the pool whether they had witnessed sexual harassment, he simply collected written statements from employees and concluded that there was no evidence of sexual harassment.  *Id.* at 71–72 (in responding to questions about whether he had asked employees if they witnessed sexual harassment, Mr. Reddick responded, "it's not my role . . . to investigate to that level").  In fact, according to Margarita Cruz, Weaver and Robert Ford "coerced" her into writing a statement for that investigation in which she exaggerated complaints about the victim's work performance.  Test. of Margarita Cruz, Trial Tr. 31–35, 53, Aug. 8, 2012.

To make matters worse, Margarita Cruz testified that she had been sexually harassed by Robert Ford.  Test. of Margarita Cruz, Trial Tr. 27–31.  Thus, one of the supervisors to whom Jean-Baptiste complained about sexual harassment had allegedly sexually harassed another supervisor to whom she also complained.

After Jean-Baptiste notified supervisors that Weaver was harassing her, she said that Weaver began to criticize her job performance, and to force her to sit in the lifeguard's chair for two and a half hours at a time, instead of the fifteen minutes recommended by the Red Cross.  *Id.*

---

[2] Although parts of the foregoing may have been hearsay, depending on whether they fall under the opposing party statement exception to the hearsay rule, *see* Fed. R. Evid. 801(d)(2), the District did not object and thus cannot complain of the admission of this evidence, *see* Fed. R. Evid. 103.

at 42–49.  She also stated that Weaver and Robert Ford threatened to have her transferred or fired if she didn't "listen to what [they] said."  *Id.* at 52.

Weaver denied touching Jean-Baptiste's hair, standing before her with an erection, using the word "pussy," or making any other sexual or romantic advances toward Jean-Baptiste.  Test. of Rodney Weaver, Trial Tr. 147–80, Aug. 8, 2012.  Instead, Weaver complained that Jean-Baptiste would eat and wear sunglasses while in the lifeguard chair and that she would disappear from work.  *Id.* at 147–56.  He stated that he made note of Jean-Baptiste's conduct in a DPR log book; however, neither Weaver nor the District was able to produce this book.  Test. of Rodney Weaver, Trial Tr. 20–21, Aug. 9, 2012.  Finally, although Weaver acknowledged that he may have threatened to write up Jean-Baptiste, he denied threatening to send her home and said he made no formal recommendations to management about whether her employment should continue.  He did, however, acknowledge recommending that she be transferred to another pool. *Id.* at 21–28; Test. of Rodney Weaver, Trial Tr. 167, Aug. 8, 2012.

In late September, Jean-Baptiste discovered that her name was not on a list of year-round DPR employees, despite her understanding that she had been hired for year-round employment. She approached several supervisors about the discrepancy.  Test. of Carmen Jean-Baptiste, Trial Tr. 59, Aug. 6, 2012.  At this time, she informed supervisor Roslyn Johnson about the sexual harassment and Johnson told her that she needed to put the complaint in writing and that she would be moved to another pool for the next two weeks.  *Id.* at 60–61.  Jean-Baptiste testified that she understood that DPR would examine its budget during this two week period, but that they would continue to employ her as a full-time employee afterwards.  *Id.* at 68–69; *but see* Pl.'s Ex. 33, Email from Harold Houston to Carmen Jean-Baptiste (Sept. 29, 2006) ("At this point, we cannot promise anything in addition to the two week extension as the department is

attempting to determine our ability to hire staff for our 2007 fiscal year."). On October 14, 2006, Jean-Baptiste emailed three DPR supervisors informing them of the sexual harassment by Weaver and stating that she would be taking legal action. Pl.'s Ex. 5.

On October 17, Jean-Baptiste reported to work and was told, with no reason given, that she no longer worked there. Test. of Carmen Jean-Baptiste, Trial Tr. 90–91, Aug. 6, 2012. The next day, Jean-Baptiste reapplied for a lifeguard position at the Takoma pool and took another lifeguard assessment. Jean-Baptiste failed two parts of the assessment but later expressed concerns about the way the assessment had been conducted. *Id* at 90–91, 101–02.; Pl.'s Ex. 39. She was not rehired as a lifeguard. No formal investigation of her sexual harassment charges seems to have been conducted prior to her departure. Jean-Baptiste filed an EEOC Charge of discrimination on November 1, 2006. Pl.'s Ex. 11.

Jean-Baptiste testified regarding the "trauma" and "uncertainty" of not having a permanent job after she was let go. She had two sons and went on food stamps, which she said was "not a good feeling" and that it made her feel like "less of a mother." Trial Tr. 125, Aug. 6, 2012. In response to how the sexual harassment and retaliation affected her, she said it "really . . . affected [her] deeply, in the sense [that she] had to go to . . . bed night after night and wake up day after day knowing that [she didn't] have an income or have a job to provide for [her] kids." *Id.* at 125. She said that it caused "stress and anxiety," that she couldn't sleep, felt sick to her stomach, gained about twenty five pounds, and had some hair loss. *Id.* at 125–26. "It had really tormented me," she said "that I went for help and I follow all the chain of command . . . and I didn't receive any help at all and no one came to my assistance . . . ." She testified that she felt withdrawn, "less of a woman," distant, and depressed, and said she spent less time with her

children and didn't go out as much. *Id.* at 127. She reported taking up acupuncture at her temple. *Id.* at 127.

After a six-day trial, the jury returned a $3.5 million verdict for Jean-Baptiste on her hostile work environment and retaliation claims under Title VII and the DCHRA, and on her WPA claim. This verdict was limited to compensatory damages. The jury asked that a recommendation be included in the record and recommended that the District, among other things, "begin an EEO training program for all DPR managers," "rewrite DPR personnel policies to remove ambiguities about the EEO complaint and investigation processes," and "initiate a review of the actions, or lack of action, taken by all DPR employees and managers at the Takoma Pool and Aquatic Program" over the period during and immediately following Jean-Baptiste's employment. Verdict Form at 4, ECF No. 185.

In response, the District filed the instant motion for a new trial, a new trial on damages, or for remittitur. Ms. Baptiste filed a Motion, ECF No. 186, seeking $485,324.90 in attorneys' fees and litigation costs, plus interest. She also filed a Motion for Equitable Relief, ECF No. 187, seeking backpay from the date her discharge to the date of final judgment in this case, reinstatement into the position she would occupy absent retaliation, and other relief.[3] These motions have been stayed pending the Court's ruling on the motion for new trial. *See* Order, Nov. 8, 2012, ECF No. 196.

---

[3] Title VII expressly allows courts to order "such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees with or without back pay . . . ." 42 U.S.C. § 2000e-5(g)(1). The D.C. Whistleblower Protection Act also allows for injunctive relief, reinstatement, back pay, and interest on back pay. D.C. Code § 1-615.54(a)(1)(A)–(G). Likewise the D.C. Human Rights Act allows for remedies including reinstatement, with or without back pay. D.C. Code § 2-1403.16(b).

## II.      DISCUSSION

### A.      New Trial Not Warranted

> *1.      Exclusion of Testimony of Arnita Bonner-Evans or Richelle Marshall Does Not Warrant New Trial*

The district argues that a new trial is warranted because the Court made "substantial evidentiary errors" that "unduly prejudiced the District's defense."  Def.'s Mot. 12.  However, even if the Court's exclusion of testimony was error, it did not cause undue prejudice and thus the Court will deny the motion for a new trial.

The District states that plaintiff's status as a temporary or seasonal employee was a "key issue at trial" and that the Court erroneously precluded Ms. Bonner-Evans or Ms. Marshall from testifying about an "employment verification form," Def.'s Ex. 105, which allegedly would have shown that Jean-Baptiste was a seasonal employee.  The District does not argue that either witness would present particular testimony other than apparently authenticating Exhibit 105. There are several problems with the District's argument.

First, although the question of whether Jean-Baptiste was a seasonal or permanent employee was an important issue, the District faced potential liability regardless of how the jury answered this question.  The Court emphasized in its earlier Memorandum Opinion that the fact that Jean-Baptiste may have been a seasonal employee would not be "an adequate response to plaintiffs' allegations . . . that DPR did not *continue* or *renew* [her] employment because [she] made accusations of sexual harassment. . . .   Failure to hire, *renew*, or promote can serve as an actionable basis for a Title VII retaliation claim."  Mem. Op. 44, Aug. 16, 2011, ECF No. 161 (emphasis added) (citing *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004); *Mitchell v. Baldridge*, 759 F.2d 80, 86 n.5 (D.C. Cir. 1985)).  The employee has the ultimate burden of showing that employment action, including a failure to renew a seasonal employee's

position, is retaliatory and not for some legitimate, non-discriminatory reason. *Id.* at 45. The defendant need only "articulate specific reasons for its actions that 'if believed by the trier of fact, could support a finding that unlawful discrimination was not the cause of the employment action.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citing *Burdine*, 450 U.S. at 254–55, n.8)).

The District spent considerable time during trial, and put forth evidence, attempting to show that Jean-Baptiste's employment ended because she was a seasonal employee and because "she was not as qualified as other candidates, as evidenced by her poor performance in the life saving assessment." Def.'s Mot. 4; *see also* Test. of Sean Link, Trial Tr. 83–84, Aug. 8, 2008 ("[W]hen I was first detailed to Takoma I was not certain of her status. My assumption was that she was a summer employee . . . and that was later confirmed . . . . My supervisor, Harold Houston, . . . told me she was a summer hire."); Test. of Harold Houston, Trial Tr. 208, Aug. 7, 2012 (stating that he did not question the accuracy of a document listing Jean-Baptiste as a summer employee); Def.'s Ex. 154 (offer letter to Jean-Baptiste stating that she had only been offered a nine-week, "temporary summer placement" but including incorrect information regarding her title and pay).

Jean-Baptiste also put forth evidence of her status as a year-round employee. In addition to her own testimony, she submitted a hiring request form indicating that she was to be hired as a "full-time" rather than a "temporary" employee. Pl.'s Ex. 2. Moreover, Jean-Baptiste showed that she worked at DPR for about twenty four weeks, significantly longer than the nine to sixteen weeks usually worked by summer employees. *See* Def.'s Ex. 154; Test. of Sean Link, Trial Tr. 101, Aug. 8, 2012. The District did not provide a credible explanation for this discrepancy. *See* Trial Tr. 27–28, Aug. 7, 2012. Finally, several witnesses testified that they had believed Jean-

Baptiste to be a year-round employee.  *See, e.g.*, Test. of Stacy Mills, Trial Tr. 53, Aug 7, 2012; Test. of Solomon Robinson, Trial Tr. 114–115, Aug. 7, 2012 (reading testimony from his deposition in which he stated that Jean-Baptiste was listed as a year-round staffer); Test. of Sylvia Gwathmey, Trial Tr. 8 (stating that she had talked with Benny McCottry, the former manager of aquatics who hired Jean-Baptiste, and that he stated he had intended for Jean-Baptiste to be hired as a year-round employee).

It is not clear whose version the jury credited.  They could have found for Jean-Baptiste regardless of whether she was a year-round or seasonal employee.  In fact, the jury verdict form accounted for the dispute regarding her employment status by asking jurors whether plaintiff had "proven . . . that [her] complaint(s) was/were a substantial or motivating factor in the District of Columbia's deciding *not to offer plaintiff permanent employment or deciding to terminate her*." Verdict Form 2, ECF No. 185 (emphasis added).  Thus, the jury's ultimate conclusion regarding whether Jean-Baptiste was a seasonal employee was not outcome determinative and any error the Court might have made in excluding the document was not prejudicial.

Even if the Court were to assume that it was vital to the District's case that Jean-Baptiste be found to be a seasonal employee, the document they sought to introduce was not particularly probative.  The "employment verification form" was prepared on June 7, 2007, eight months *after* Jean-Baptiste's termination and her filing of an EEOC charge.  The form states that the reason she left DPR was "summer employment."  This type of post hoc explanation of Jean Baptiste's employment status is hardly convincing, particularly given that the District was anticipating legal action by Jean-Baptiste on her sexual harassment and retaliation claims.  The document's probative value is thus slim and the jury could have easily disregarded it, particularly given the evidence Jean-Baptiste offered to support her status as a year-round employee.

2.      *The District Has Waived Any Challenge to the Adverse Inference Instruction*

The District argues that the Court erroneously instructed the jury that "[i]f the defendant destroys personnel records" relevant to a Title VII charge or action, the jury "should presume that any such documents would have been beneficial to Jean-Baptiste and adverse to the defendant." Jury Instructions at 5, ECF No. 180.   At trial, the District had not been able to produce an employment contract for Jean-Baptiste or log books in which Jean-Baptiste's supervisor had allegedly written up Jean-Baptiste for infractions at work.  Trial Tr. 54–59, Aug. 9, 2012.  The District also belatedly produced a missing page from the lifeguard assessment that Jean-Baptiste had failed after her employment ended.  *Id.* at 59.   However, the District has waived this argument because it did not properly object to the instruction at trial.

Federal Rule of Civil Procedure 51 provides that a "party who objects to an instruction. . . must do so on the record, stating distinctly the matter objected to *and the grounds* for the objection." Fed. R. Civ. P. 51(c)(1).  Such an objection is timely if made before the instructions and arguments are delivered and out of the jury's hearing.  Fed. R. Civ. P. 51(c)(2)(A), 51(b)(2). Failing to object and provide grounds for objection before the jury begins deliberation will result in a waiver of the right to challenge the instruction.

The D.C. Circuit has stated that "Rule 51 requires a *specific objection* to preserve an issue for appeal. . . ." *Graham v. Davis*, 880 F.2d 1414, 1419–20 (D.C. Cir. 1989).  In *Parker v. District of Columbia*, the circuit held that the District of Columbia had "neglected to state distinctly its specific objections to [the court's] charge before the jury retired to deliberate" and that "[a]bsent such specified objection, it would be overreaching for this court to reject the instructions and to upset the jury's verdict."  850 F.2d 708, 715 (D.C. Cir. 1988).  "Requiring counsel to *state specifically* his objections to the court's instructions immediately before the jury

retires to deliberate enables the district court to cure any errors it may have made in the instructions." *Graham*, 880 F.2d at 1420; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 815 n.3 (1985) (stating that "[Rule] 51 requires counsel objecting to a jury instruction to 'stat[e] distinctly the matter to which he objects *and the grounds* of his objection'" and implying that an objection made at trial was insufficient where the petitioner had stated only that it objected to "'the Oklahoma City language . . . which is single occurrence language'").[4]

Although the District objected to the inclusion of the adverse instruction during trial, it never stated the basis for this objection. Trial Tr. 59–60, Aug. 9, 2012.  The District only stated "Just so that the record is clear, now that the alleged missing documents have been identified, the District objects to the adverse inference instruction."

The District's Reply brief provides no convincing arguments to the contrary.  The District suggests that, at trial, it stated that it "object[ed] to the adverse inference instruction," and that this "language was clear and specific in its articulation of the object of the objection . . . ."  The District argues that this was not a "general objection" which would be insufficient to preserve the argument for its motion.  However, while the District may have "clear[ly] and specific[ally]" articulated the *object* of its objection, it never provided the *grounds* of its objection.  This omission is fatal to preservation of the objection.

The cases the District cites do not suggest otherwise.  For example, the District argues that its objection to the adverse inference instruction is "similar in language and specificity" to

---

[4] Most cases addressing Rule 51's requirement that a party object to a jury instruction in a timely and specific way deal with the preservation of that objection on appeal.  However, Rule 51's requirement applies equally to preservation of the argument in the context of a motion for new trial.  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 255 (1981) (noting that questions regarding an unchallenged punitive damage instruction "perhaps could have been avoided simply by a reliance, under Rule 51, upon petitioner's procedural default [of failing to object]"); *see also* 9C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Civ. § 2553 (3d ed.) ("As many courts have held, objections under Rule 51(c) to the instructions made after the jury retires and has begun deliberating are not timely and will not be considered on appeal or on a motion for a new trial.").

the "specific objection" held sufficient in *Kostelec v. State Farm Fire & Cas. Co.*, 64 F.3d 1220, 1224–25 (8th Cir. 1995).  Reply at 4–5 (citing *Kostelec*).  However, the *Kostelec* court did not provide the substance of the objection at issue there, stating only that State Farm had "specifically objected" to the instruction.  64 F.3d at 1225.  The District also seeks to distinguish this case from cases in which parties either did not object at all, *see* Reply at 5–6 (citing *Hobson v. Wilson*, 737 F.2d 1, 31 (D.C. Cir. 1984) and *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1375 (Fed. Cir. 2010)), or in which the plaintiff actually acquiesced to the disputed jury instruction, *id.* at 6 (citing *Westcott v. Crinklaw*, 133 F.3d 658, 662 (8th Cir. 1998)).  These cases do not inform the situation at hand, where the District objected to the instruction but failed to provide the Court with grounds for its objection, as required by Rule 51.

The District failed to preserve its objection to the adverse inference instruction and cannot now argue for a new trial on the basis of any alleged error in the giving of the instruction.

## B.    Remittitur is Appropriate

The District moves for a new trial on damages or, in the alternative, for remittitur.  Specifically, the District argues that the jury award of $3.5 million was the product of an unfair trial, beyond all reason, and so great as to shock the conscience and warrant a remittitur.  In arguing the trial was unfair, the District rehashes some arguments the Court has already dispensed with above.  Thus, the Court now addresses only the arguments for remittitur.

### 1.    Legal Standard for Remittitur

Federal trial courts may review jury awards of damages for excessiveness and may order remittitur or a new trial where damages are found excessive.  *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996) ("This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict

winner's refusal to agree to a reduction (remittitur).").  District courts "[have] broad discretion to order a remittitur in lieu of a new trial." *Hooks v. Wash. Sheraton Corp.*, 578 F.2d 313, 316 (D.C. Cir. 1977).  However, reduction of a compensatory damage award may not be made without offering plaintiff the option of a new trial. *Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211 (1998) (noting that the circuit court's order requiring the district court to enter judgment "for a lesser amount than that determined by the jury without allowing petitioner the option of a new trial, cannot be squared with the Seventh Amendment").[5]

In this Circuit, remittitur is appropriate only when either "(1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." *Peyton v. DiMario*, 287 F.3d 1121, 1126–27 (D.C. Cir. 2002) (internal citations omitted).  Courts may not set aside a verdict merely because the judge would have awarded a different amount, 11 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2807 (3d ed.), and courts "must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." *Langevine v. Dist. of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997) (citation omitted).

Once a court determines that remittitur is appropriate, reduction is only allowable if it "'permit [s] recovery of the highest amount the jury tolerably could have awarded.'" *Langevine*,

---

[5] The Seventh Amendment requires that "the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const., amend. VII.

> [T]he Reexamination Clause does not inhibit the authority of trial judges to grant new trials 'for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.'  That authority is large.  'The trial judge in the federal system . . . has . . . discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence.'  This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).

*Gasperini*, 518 U.S. at 433 (internal citations omitted).

106 F.3d at 1024 (internal citations omitted).  Beyond this admonition, however, there is little guidance as to how district court judges should determine the "highest amount the jury tolerably could have awarded."

Some courts have utilized comparisons between similar cases to determine the appropriate range for a jury award, however, the D.C. Circuit, in an opinion by Judge Sentelle, has noted the "awkward[ness]" of this inquiry.  In *Peyton v. DiMario*, for example, the appellant employer argued that the district court should have reduced a jury verdict of $482,000 to an amount below the Title VII statutory cap of $300,000, which the trial judge had already imposed.  287 F.3d at 1127.  The Circuit first rejected the notion that Title VII requires verdicts to be determined on a sliding scale based on the egregiousness of the unlawful conduct, instead stating that "the proper approach is to determine whether the judgment awarded, regardless of whether it is the statutory maximum, is supported by evidence, and does not shock the conscience, or is not inordinately large so as to be obviously unreasonable."  *Id.*  The Circuit went on to state:

> The cases that appellant offers for purposes of comparison in which lesser damages were awarded or approved do not convince us to the contrary.  In rejecting that line of argument, we find useful the reasoning of a state court . . . . '[T]here is no way of obtaining uniformity in the amount juries and trial judges may award for damages . . . .  Because of the unique circumstances of each case as well as the adjustments which would necessarily have to be made for inflation, it is awkward to discuss the size of an award through comparison with past decisions.'  Just so here.

*Id.* (citations omitted).

Comparisons between cases can indeed be difficult.  Jury verdicts are not published in the same manner as opinions of the court.  Although commercial databases include summaries of jury verdicts, these do not provide significant detail about the testimony provided or the basis for the verdict.  To make an appropriate comparison between jury verdicts, one would need to know the damages alleged; whether the damages represent purely compensatory, non-economic

damages; what evidence was offered to support the alleged damages; etc.  Moreover, even such information does not provide more subtle details such as jury assessments of witness credibility.

Some courts, and the parties here, have thus argued that comparison with other cases is inappropriate.  *See, e.g.*, *Ramseur v. Barreto*, 213 F.R.D. 79, 84 (D.D.C. 2003) ("[T]his circuit has also rejected such comparisons as a basis upon which to determine whether remittitur should be ordered."); Pl.'s Opp'n at 35 ("Plaintiff agrees with Defendant that . . . factual comparisons across cases are not useful (nor acceptable, per the D.C. Circuit) for determining when remittitur is appropriate.").  Nevertheless, the parties have provided comparison cases to illustrate an appropriate range of awards.  *See* Pl.'s Opp'n at 35–36 ("[A] survey of recent jury awards is instructive as to what sort of award falls within a permissible range . . . ."); Def.'s Mot. at 29–30 ("Comparisons *are* useful . . . to place jury awards in employment cases into context . . . .").

Moreover, other district courts in our Circuit have suggested a willingness to consider comparison with similar cases.  *See Liberatore v. CVS New York, Inc.*, 160 F. Supp. 2d 114, 118–21 (D.D.C. 2001) (noting Judge Urbina's reliance on case comparisons in *Nyman v. FDIC*, 967 F. Supp. 1562 (D.D.C. 1997), and stating that such reliance "remains valid" in analyzing a remittitur motion); *see also Alkire v. Marriott Int'l, Inc.*, 2007 WL 1041660 (D.D.C. Apr. 5, 2007) (seeming to suggest, although ultimately declining to consider other cases, that the awards offered by the moving party for comparison would have been more instructive if they had included all damage awards, rather than just affirmative awards of remittitur).

Finally, there has been little in the way of alternative guidance to suggest how district courts should determine the "highest amount the jury tolerably could have awarded."  In some circumstances, district courts appear to have simply, without explanation, chosen an amount for remittitur.  *See, e.g., Farar v. Wash. Metro. Area Transit Auth.*, CIV.A. 87-0142-OG, 1988 WL

43861 at *6 (D.D.C. Apr. 26, 1988) (holding, without explanation, that $80,698, or $30,000 below the original jury verdict, was the maximum amount the jury could have awarded).

In short, although the Court is cognizant of the limitations of case comparisons, it does not equate the D.C. Circuit's caution in this area with a prohibition. Courts must have *some* guidepost with which to determine whether a remittitur is appropriate and what amount serves as the "highest level the jury tolerably could have awarded." Thus, the Court here will consider, at least in part, similar cases to determine the appropriate award for damages.

2.    *Legal Standard for Damages Award in This Case*

Title VII provides for compensatory, but not punitive, damages against state and local governments. 42 U.S.C. § 1981a(b)(1). Such damages are capped at $300,000 per complainant for large employers, *id.* § 1981a(b)(3), and may not include backpay or interest on backpay, *id.* § 1981a(b)(2).[6] The plaintiff bears the burden of proving she suffered noneconomic injuries such as emotional distress, pain and suffering, reputational harm, etc. *Peyton*, 287 F.3d at 1126. "Compensatory damages must be proven and cannot be presumed." *Id.* (citing *Carey v. Piphus*, 435 U.S. 247, 263–64 (1978)). When a party requests compensatory damages in a jury trial, the jury is not to be informed of Title VII's cap on damages. 42 U.S.C. § 1981a(c)(2); *see also Martini v. Fed. Nat. Mortg. Ass'n*, 178 F.3d 1336, 1349 (D.C. Cir. 1999).

The D.C. Human Rights Act (DCHRA) and the D.C. Whistleblowers Protection Act (WPA) also allow for the recoupment of compensatory damages. *See* D.C. Code § 2-1403.16 ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action . . . for damages and such other remedies as may be appropriate . . . . The court may grant any relief it deems appropriate . . . ."); D.C. Code § 1-615.54 ("An employee aggrieved by

---

[6] In our Circuit, the $300,000 cap appears to apply per plaintiff and not per claim. *See Peyton*, 287 F.3d at 1124 (noting that the trial court "reduced the amount of compensatory damages recoverable to $300,000, the statutory maximum under Title VII" where plaintiff had prevailed on both hostile work environment and retaliation claims).

a violation of § 1-615.53 may bring a civil action against the District seeking relief and damages, including . . . (D) Restoration of lost benefits; (E) Back pay and interest on back pay; (F) Compensatory damages; and (G) Reasonable costs and attorney fees.")

Punitive damages are not at issue here and the jury was instructed only to calculate compensatory damages, if applicable.  *See* Jury Instructions 8, ECF No. 180 ("[Y]ou should assess the amount you find to be justified . . . as full, just, and reasonable compensation for all of the plaintiff's damages [with respect to the hostile work environment claim]. . .  Compensatory damages are not allowed as punishment . . . ."); *id.* at 9 ("If you find for Ms. Jean-Baptiste on her claim that the defendant retaliated . . . you must determine whether she is entitled to damages in an amount that is fair compensation. . . .  You may award compensatory damages for emotional pain and suffering, inconvenience, and mental anguish . . . ."); *id.* at 11 ("If you find for the plaintiff [on her Whistleblower claim], then you must award the plaintiff a sum of money which will fairly and reasonably compensate her for all the damage which she experienced . . . ").[7]

The jury was not asked to allocate damages among the plaintiff's causes of action. However, this should not affect the Court's determination of the appropriate award.  Under the doctrine of double recovery, absent punitive damages, a "plaintiff can recover no more than the loss *actually suffered*."  *Kassman v. Am. Univ.,* 546 F.2d 1029, 1033 (D.C. Cir. 1976) (emphasis added) (internal citations omitted).  When a plaintiff seeks compensation for wrongs against him, he "should be made whole for his injuries, not enriched."  *Medina v. Dist. of Columbia*, 643 F.3d

---

[7] Neither the WPA nor the DCHRA provide explicitly for punitive damages. "[A]s a general rule there can be no recovery of punitive damages against a municipality absent a statute expressly authorizing it," *Smith v. Dist. of Columbia*, 336 A.2d 831, 832 (D.C. 1975), or absent "extraordinary circumstances."  *Hunter v. Dist. of Columbia*, 384 F. Supp. 2d 257, 262 n.4 (D.D.C. 2005) (citing *Smith v. Dist. of Columbia*, 336 A.2d 831, 832 (D.C. 1975)). "[E]xtraordinary circumstances" may exist, for example, "where a jurisdiction's taxpayers are directly responsible for perpetrating the policies that caused the plaintiff's injuries [or] where a municipality or its policymakers have intentionally adopted the unconstitutional policy that caused the damages in question." *Daskalea v. Dist. of Columbia*, 227 F.3d 433, 447 (D.C. Cir. 2000).  No such extraordinary circumstances were alleged here and the jury thus considered only compensatory damages.

323, 326 (D.C. Cir. 2011). Thus, even where a party brings claims based on different theories, both state and federal, a party "'cannot recover the same damages twice.'" *Id.* (quoting *Bank One, Tex., N.A. v. Taylor,* 970 F.2d 16, 34 (5th Cir. 1992)). Nevertheless, to the extent that a verdict based on both Title VII and state law causes of action exceeds the $300,000 Title VII cap, the trial court should allocate any damages above the cap to the state law claims. *See Martini v. Fed. Nat. Mortg. Ass'n*, 178 F.3d 1336, 1349 (D.C. Cir. 1999).

### 3. *Remittitur is Appropriate as to Jean-Baptiste's Damages Award*

A $3.5 million verdict for the damages alleged by Jean-Baptiste is so great as to "shock the conscience" and "so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate."

Jean-Baptiste provided the Court with a range of multimillion dollar verdicts from other circuits to bolster her award. These cases do not help Jean-Baptiste's argument and may even hurt it. While she provides examples of cases in which plaintiffs were awarded between $1.6 and $39 million in compensatory or non-economic damages, these broader figures conceal the fact that in many of the cases, the actual awards for compensatory, non-economic damages (as in the case at bar) were much smaller or were later litigated in motions for remittitur. For example, although the Sixth Circuit affirmed a $6 million compensatory award in *Morgan v. New York Life Insurance Co.*, only $500,000 of that award was for non-economic damages. 559 F.3d 425, 443 (6th Cir. 2009). The Sixth Circuit's opinion does not detail the injuries suffered by the plaintiff or the evidence he presented and thus the Court cannot compare this $500,000 award with the case at hand. Similarly, only $500,000 of the $2 million award cited in *Watson v. E.S. Sutton, Inc.*, was attributed to emotional damages and this was later reduced to $120,000

pursuant to a remittitur. *See Watson v. E.S. Sutton, Inc.*, 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005) *aff'd*, 225 F. App'x 3, 4 (2d Cir. 2006). The District Court, in ordering remittitur, noted:

> [The plaintiff] has not pointed us to any comparable cases—that is, cases with no permanent psychological damage or disability resulting from the harassment—with awards so high as the one the jury here gave her. The decisions she has cited approving multi-hundred-thousand dollar awards for emotional damages all involve post-traumatic stress disorder, and plaintiffs who were forced to be medicated and out of work for extended periods of time. The Court is confident that $500,000 is well outside the acceptable range of damages [of $30,000 to $125,000] . . . for emotional distress in adverse employment action cases lacking extraordinary circumstances.

*Id.* at 15–16.

Likewise, in *Aqeel v. Our Common Welfare, Inc.*, cited by Jean-Baptiste, the $1.6 million compensatory damage award was reduced to $125,000 after a motion for new trial or remittitur. No. 1:05-cv-02546 (N.D. Ga. Nov. 13, 2007); No. 1:05-cv-02546 (N.D. Ga. Dec. 7, 2007).[8] In that retaliation case, the court noted that the plaintiff's injuries included humiliation when she couldn't afford groceries after her termination, the emotional turmoil of filing for bankruptcy, damages to her reputation, and other aspects of her emotional pain and suffering. No. 1:05-cv-02546 (N.D. Ga. Nov. 13, 2007).

In our Circuit, a handful of verdicts have awarded over $1 million for discrimination or retaliation. However, the Court lacks sufficient information regarding these verdicts to

---

[8] Ms. Jean-Baptiste also cites two cases which were later subject to motions for new trial or remittitur and which ultimately settled for undisclosed sums. Given the uncertainty about the level to which these verdicts might have been reduced pursuant to remittitur, the awards are not particularly instructive here. *See Alford v. Aaron's Rents, Inc.*, No. 3:08-cv-00683 (S.D. Ill. June 10, 2011) (jury award of $15 million in non-economic, compensatory damages, reduced by $3.7 million because of Title VII's $300,000 cap, and later subject to a motion for new trial or remittitur and settled for an unspecified sum); *Chopourian v. Catholic Healthcare West d.b.a. Mercy Hosp. and Mercy Gen. Hosp.*, No. 2:09-cv-02972 (E.D. Cal. Mar. 19, 2012) (jury award of $39 million in non-economic damages based on numerous causes of action, including several unrelated to sexual harassment or retaliation such as defamation, and later subject to a motion for new trial or remittitur and settlement).

determine whether they represent solely compensatory damages and, if so, whether they are limited to non-economic damages.[9]

Moreover, Judge Urbina of this district, previously conducted an extensive survey of discrimination and retaliation verdicts and found the range of awards to be much lower—in the tens to hundreds of thousands of dollars.  In *Nyman v. FDIC*, Judge Urbina acknowledged that discrimination and retaliation cases "are fact-specific and that comparisons between cases are difficult to make" and that "in arriving at a figure the court should rely primarily upon the evidence introduced at trial."  967 F. Supp. 1562, 1571, 1580–84 (D.D.C. 1997).  Nevertheless, the Court stated that "[c]omparisons . . . are useful in helping the court determine whether or not a given damage award falls within a permissible range."  *Id.*  After surveying cases from this and other circuits, Judge Urbina concluded that, "in discrimination and retaliation cases the range of jury awards is generally between $10,000 and $150,000."  Even adjusting for inflation, this is far below the $3.5 million awarded here.

This Court has also examined similar cases to determine whether more recent awards suggest a higher amount.  Comparisons are difficult in the Title VII arena because any award over $300,000 is reduced to the statutory maximum of $300,000 and thus it is unclear whether judges in these cases would otherwise have subjected such damages to remittitur.  *See, e.g.,* *Ramseur v. Baretto*, 213 F.R.D. at 80 (noting that compensatory award of $420,000 was reduced

---

[9] *See, e.g., Bremer v. U.S. Dep't of Commerce*, 2005 WL 3369760 (D.D.C. Aug. 10, 2005) ($3 million in unspecified damages, which may have included economic damages, awarded in Title VII disability discrimination and retaliation case but ultimately reduced to $300,000 statutory cap); *Fogg v. Ashcroft, U.S. Marshals Serv.*, 1998 WL 35271706 (D.D.C. April 1998) ($4 million in unspecified damages, ultimately reduced to $300,000, in Title VII race discrimination and retaliation case alleging hostile work environment, wrongful termination, and denial of promotions, overtime, and choice assignments); *Mackel v. Wash. Metro. Area Transit Auth.*, 2001 WL 1782324 (D.C. Super. Oct. 2001) ($1.7 million in unspecified damages, ultimately reduced to $300,000 statutory cap, awarded to male manager who claimed retaliation in violation of Title VII after he testified at the discrimination trial of a female employee); *Kumi v. Curtis Dworken Chevrolet*, 1997 WL 33107008 (D.C. Super. Mar. 25, 1997) ($1.6 million in compensatory damages awarded in race discrimination case to two plaintiffs and appearing to include damages not only for humiliation, loss of enjoyment of life, and emotional distress, but also loss of income due to a failure of the defendant to promote plaintiffs to management positions).

to $300,000).  However, some Title VII cases are instructive.  For example, one Title VII case suggests that an award of $300,000 did not "shock the conscience" in a case where

> [Plaintiff] had worked her way up the ladder . . . , won a desirable apprenticeship, was harassed by a superior in the final months, was threatened, intimidated, physically assaulted, suffered retaliation for attempting to exercise her rights under Title VII, and was ultimately fired for exercising her rights . . .[and where the] evidence support[ed] the district court's finding that she became depressed, angry, and suffered a loss of self-esteem.

*Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C. Cir. 2002).  In *Peyton*, the D.C. Circuit upheld the district court's reduction of a $482,000 compensatory damage award to the Title VII statutory maximum of $300,000, despite the defendant's argument that this amount was grossly excessive in light of plaintiff's injuries.  In essence, the circuit court held that the district court acted within its discretion in finding that this amount did not shock the conscience.  *Peyton*, 287 F.3d at 1128 (noting however, that the court "might have decided this issue differently were it before [the court] *de novo*").

Cases of discrimination, retaliation, and wrongful termination under state law may also be instructive.  At the high end of the range is *Campbell-Crane v. Stamenkovic*, 44 A.3d 924 (D.C. 2008).  There, the plaintiff sued his employer for sexual harassment and retaliation under the DCHRA and the jury returned a verdict of $800,000 in emotional distress damages.  However, the sexual harassment took place for over three years and included overt sexual advances and demands.  The victim was afraid that if he displeased the defendant, she would not sponsor his work visa and he would be deported.  He reported anxiety, depression, sleeping disorders, stomach pains, and weight fluctuations, among other symptoms, and his physician testified that he had major depression and post-traumatic stress disorder and that he would require ongoing medication and cognitive therapy.  *Id.* at 945–46.  The case thus differs from the case at hand in that it involved long-term sexual harassment, veiled threats not just of workplace

retaliation but of possible deportation, and corroborating testimony of a physician as to the emotional distress the plaintiff suffered.   The award is significantly higher than what is warranted here.

In *Liberatore v. CVS*, a jury awarded $1.1 million in emotional distress damages in a wrongful termination suit which Judge Roberts ordered remitted to $200,000.  160 F. Supp. 2d 114 (D.D.C. 2001).  The plaintiff pharmacist had threatened to inform the FDA that his employer stored drugs at inappropriate temperatures.   After the threat, the pharmacist became frightened and uncomfortable and, after his termination, he worried about money, lost his home as well as the new home he was going to buy, was forced to relocate to another state without his family, and felt humiliated and nervous.  He reported no physical or psychological problems and did not offer expert reports or testimony.   Judge Roberts noted that although the plaintiff was not required to present witnesses to corroborate his own testimony about his emotional distress, his testimony alone did not provide the "substantial evidentiary basis needed to warrant" an award of $1.1 million.

In *Martini v. Federal National Mortgage Association*, the jury awarded $615,000 in damages for pain and suffering against three defendants, which the district court later remitted to $200,000.  977 F. Supp. 464, 475–78 (D.D.C. 1997) *vacated on other grounds by* 178 F.3d 1336 (D.C. Cir. 1999).   In that case, the plaintiff had alleged sexual harassment by a co-worker and retaliation under Title VII and the DCHRA.   After the co-worker was promoted, he eliminated the plaintiff's job.   As a result, she reported having stomach pains, grinding her teeth, and enduring humiliation and distress when terminated, as well as fears about the future.   She presented evidence from her treating physician and dentist.

The District suggests that $300,000, while "far greater than the amount of damages proven at trial, is the highest amount tolerable to prevent a miscarriage of justice." Def.'s Mot. 23. However, the District appears to have selected this amount in part because it is the cap imposed under Title VII. *Id.* at 33 ("[R]emitting the jury verdict to a sum not to exceed the Title VII statutory amount of $300,000 . . . is fair and just. Indeed, Congress has included a statutory cap that it reasoned would be just and fair."). However, as the District acknowledges, Jean-Baptiste brought her claims not only under Title VII, but under the District's Human Rights and Whistleblower Protection Acts, neither of which impose a statutory cap.

This Court will not impose a federal cap on plaintiff's state-law claims. Nor will it look to federal law to determine what is "fair and just" with respect to state-law claims. If the District of Columbia wishes to cap the damages plaintiffs can recover against private or government defendants, it may, but this Court cannot impose a cap where the City Council has not seen fit to do so.

After evaluating discrimination and retaliation cases as well as their degree of similarity, and considering Judge Urbina's finding that $150,000 was, in 1997, at the high end of the range for discrimination and retaliation cases, the Court finds that $350,000 is the highest amount a jury tolerably could have awarded.

The conduct alleged in this case was no doubt disgusting and extremely troubling, and the jury had good reason to be disturbed by the facts. In finding the District liable on Jean-Baptiste's hostile work environment and retaliation claims, the jury apparently credited the testimony of Ms. Jean-Baptiste and other witnesses. Jean-Baptiste described a work atmosphere in which, from the beginning of her employment, her supervisor asked her out on dates, asked her to accompany him on an overnight trip, spoke to her in sexually crude language, and sexually

propositioned her.  Jean-Baptiste also stated that he ogled her while she stood before him in her bathing suit and that he had an erection while looking her over.  Finally, after she complained, she stated that he began to criticize her work and to force her to sit in the lifeguard chair for hours at a time.

The District's apparent failure to respond to Jean-Baptiste's complaints and the absence of adequate procedures to address complaints of sexual harassment in general are just as troubling.  Jean-Baptiste testified that she spoke with six supervisors at various levels within DPR and that at least two women complained on her behalf.  Yet no one in DPR appropriately investigated or remedied the situation.  Jean-Baptiste also testified that she was forced to present at least one of her complaints in a meeting with her harasser.

Witness testimony also suggested that there were ambiguities or even inaccuracies in the sexual harassment policy the District provided to its employees.  The former EEO Officer testified that DPR would only investigate complaints of sexual harassment if they were submitted in writing, despite the fact that the District's policy suggested that employees could merely "report the conduct to [their] supervisor" and that "[o]nce [the] supervisor has been made aware of the conduct the department will initiate an investigation and take the appropriate steps to ensure the conduct ceases."  Pl.'s Ex. 74.  The policy further stated that victims could "[c]ontact the human resources office" at the telephone numbers provided.

Finally, the testimony painted a picture of a work environment in which male supervisors could harass female employees without repercussion because they had "a boys club from the top down."  Test. of Stacy Mills, Trial Tr. 48–49, Aug. 7, 2012 ("[The director of aquatics] was . . . their . . . friend and savior . . . and Ford and [Weaver] . . . could do whatever they wanted . . . .").

Yet despite this disturbing picture, the fact remains that Jean-Baptiste may only be compensated for injuries actually incurred and caused by the actions of the District. Punitive damages were not available in this case. If the jury imposed an award to punish the District, rather than to compensate Jean-Baptiste, the Court should remit the award to an amount actually supported by the evidence presented.

Jean-Baptiste's testimony regarding her injuries simply was not sufficient to support a $3.5 million verdict. She testified that the sexual harassment and retaliation "affected [her] deeply" and that she felt "less off," "very bad," and "less of a mother" for having to depend on food stamps. Trial Tr. 125–28, Aug. 6, 2012. She also said that the episode brought her stress, anxiety, and depression, that she had trouble sleeping, felt "withdrawn" and "depressed," gained twenty five pounds, and had "some hair loss." *Id.* Although these injuries could be severe, her testimony on the topic amounted to only two to three of the approximately 200 pages of the transcript of her testimony. Further, despite stating that it would take her "years" to forget what happened, she did not detail the severity or duration of her psychological injuries.

Moreover, apart from one comment by Takoma volunteer Stacy Mills, Jean-Baptiste presented no corroborating testimony as to her mental or physical state or the impact the harassment and retaliation had on her. Mills testified that Weaver and Robert Ford would keep Jean-Baptiste in the lifeguard chair for long periods of time and would follow her around to see where she was going. During these interactions, Mills said that Jean-Baptiste looked "stressed," "frustrated," and "kind of nervous . . . she could barely talk". Trial Tr. 47, Aug. 7, 2012. Jean-Baptiste offered no testimony from a medical or psychological professional regarding the impact the harassment and retaliation had on her physical or mental health. She stated only that because her "energy level" was down, she began acupuncture at her temple on the advice of her pastor.

Trial Tr. 127, Aug. 6, 2012.  She offered no testimony from the pastor or acupuncturist.  Apart from the acupuncture, she does not appear to have sought medical or psychological treatment.

While plaintiffs are not required to offer expert testimony to support a damages award, *see Jefferson v. Milvets Sys., Tech., Inc.*, 986 F. Supp. 6, 8 (D.D.C. 1997), the weight of the evidence must support the damages given.  For example, in *Liberatore v. CVS*, the court noted that while the plaintiff "was not required to present witnesses to corroborate his own testimony about his emotional distress . . . [his] testimony alone [did] not provide the substantial evidentiary basis needed to warrant an award" of $1.1 million.  160 F. Supp. 2d at 20; *see also id.* (citing *Spence v. Bd. of Educ.*, 806 F.2d 1198, 1201 (3d Cir. 1986) (holding that "emotional distress damages may not be presumed," and that plaintiff's testimony in that employment retaliation case, by itself, was insufficient to support jury's award for emotional distress damages)).  Similarly, in *Hetzel v. Cnty. of Prince William*, the Fourth Circuit held that an award of $500,000 for emotional distress on a Title VII retaliation claim was "grossly excessive" and remanded to the district court with instructions to recalculate the award.  89 F.3d 169, 173 (4th Cir. 1996).  In so doing, the court noted that the award was based "almost entirely on plaintiff's own self-serving testimony" and that of her co-workers and that the plaintiff had never seen a doctor, therapist, or other professional.

In short, this evidence falls far short of that warranting a $3.5 million award.

## III.   CONCLUSION

The District's motion for a new trial will be denied.  The Court's exclusion of testimony by Arnita Bonner-Evans or Richelle Marshall, even if it was error, did not cause undue prejudice.  Additionally, the District failed to preserve its objection to the adverse inference instruction and cannot now argue for a new trial on the basis of any alleged error in the giving of that instruction.

However, the District's motion for remittitur will be granted.  The jury's verdict that the District violated Title VII, the DCHRA, and the WPA is supported by the evidence.  Jean-Baptiste presented evidence that, if believed, suggested she was sexually harassed by Rodney Weaver, that she and others repeatedly reported his conduct to management without response, and that her employment was either terminated or not continued in response.  However, Jean-Baptiste did not present evidence that she is owed compensatory damages in the realm of $3.5 million.  The Court finds that the highest amount the jury tolerably could have awarded, based on the damages she established, is $350,000.  Jean-Baptiste will have twenty one days from the date of this Opinion to inform the Court and the defendant, in writing, of her decision whether to accept this reduced award or to proceed to a new trial on damages.  An Order consistent with this Memorandum Opinion issues this date.

Signed by Royce C. Lamberth, Chief Judge, on March 18, 2013.