# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CARMEN JEAN-BAPTISTE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 11-1587 (RCL) |
| | ) | |
| DISTRICT OF COLUMBIA | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

A jury found for plaintiff Carmen Jean-Baptiste on her Title VII and D.C. Human Rights Act (DCHRA) sexual harassment claims, her Title VII and DCHRA retaliation claims, and her D.C. Whistleblower Protection Act (WPA) claims. Jean-Baptiste now moves [187] for equitable relief pursuant to those three statutes.

## I.  BACKGROUND

The facts of this case are outlined in detail in the Court's April 2013 Memorandum Opinion denying the District's motion for a new trial and granting a motion for remittitur. *See Jean-Baptiste v. Dist. of Columbia*, __ F. Supp. 2d __, 2013 WL 1092896 (D.D.C. Apr. 24, 2013). Thus, only a brief summary follows here.

In 2006, Jean-Baptiste was hired as a lifeguard by the District of Columbia Department of Parks and Recreation ("DPR"). The parties disputed whether she was hired as a seasonal or year-round employee. Jean-Baptiste reported to Assistant Pool Manager Rodney Weaver and alleged that Weaver sexually harassed her. After she reported Weaver's conduct, she alleges that Weaver and the District retaliated against her and ultimately terminated her employment in mid-

October 2006.  Jean-Baptiste immediately reapplied for a lifeguard position.  She failed two parts of the lifeguard assessment that the Department administered, but complained about the way the assessment had been conducted.  She was not rehired.  The District argued that she was terminated because her employment was only seasonal and that she was not rehired because she failed the lifeguard assessment.

A jury found for Jean-Baptiste on her hostile work environment and retaliation claims under Title VII and the DCHRA, as well as her WPA claim.  The $3.5 million verdict was limited to compensatory damages and did not distinguish between the damages awarded under each statute.  The jury also took the unusual step of making policy recommendations to the District of Columbia.  Specifically, it recommended that the District "begin an EEO training program for all DPR managers," "rewrite DPR personnel policies to remove ambiguities about the EEO complaint and investigation processes," and "initiate a review of the actions, or lack of action, taken by all DPR employees and managers at the Takoma Pool and Aquatic Program" over the period during and immediately following Jean-Baptiste's employment.  Verdict Form at 4, ECF No. 185.

This Court denied the District's post-trial motion for new trial or new trial on damages, but granted the District's motion for remittitur.  Order, ECF No. 200.  Jean-Baptiste subsequently accepted a reduced compensatory award of $350,000.  Notice of Acceptance of Remittitur, ECF No. 202.

Jean-Baptiste now seeks equitable relief in the form of (1) back pay, plus pre-judgment interest, from the date of her discharge to the date of final judgment in this case; (2) reinstatement into the position she would occupy absent the retaliation she suffered (including any training and re-certification required for that position, and front pay during any such training

or re-certification); (3) a permanent injunction ordering the District to refrain from any further sexual harassment of or retaliation against her; and (4) an order requiring the District to take affirmative steps suggested by the jury in its attachment to the jury verdict.  Pl.'s Mot. Equitable Relief 1–2, ECF No. 187 [hereinafter Pl.'s Mot.]; *see also* Pl.'s Mem. P. & A. in Support of Mot. Equitable Relief 7, ECF No. 187 [hereinafter Pl.'s Mem.].

## II.    LEGAL STANDARD GENERALLY

Title VII provides:

> If the court finds that the [employer] has intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement . . . with or without back pay . . . , or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).

Title VII gives district courts "wide discretion to award equitable relief.  The district court should fashion this relief so as to provide a victim of employment discrimination the most complete make-whole relief possible."  *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) (internal citations omitted).

The DCHRA also provides for equitable relief including "hiring, reinstatement or upgrading of employees, with or without back pay," "admission to or participation in a program, apprenticeship training program, on-the-job training program or other occupational training or retraining program," D.C. Code §§ 2-1403.13(a), 16(b), and, where necessary to "prevent irreparable harm," temporary restraining orders and preliminary injunctions, D.C. Code § 2-1403.07.

Finally, the WPA identifies available relief as reinstatement to the same position held before the prohibited personnel action or to an equivalent position, restoration of lost benefits, back pay and interest on back pay, and injunctions.  D.C. Code § 1-615.54(a)(1)(A)–(E).

## III.   DISCUSSION

### A.   Reinstatement

Jean-Baptiste seeks reinstatement into either a year-round lifeguard position or a higher level CS-11 aquatics facility management position.   Pl.'s Mem. 9.   She argues that a CS-11 position would offer her union protections and that she is qualified to serve in such a position. *Id.*   She suggests that progression from lifeguard to a facility management position in the seven years since her termination would represent a career trajectory similar to that of Sean Link, who served as the "Aquatics Program Manager," or "Aquatics Director."   Trial Tr. 58, Aug. 8, 2012. Should Jean-Baptiste require additional certifications, she seeks front pay until she can receive the certifications and reimbursement for the cost associated with the certifications.   *Id.* at 9–10.

The District opposes reinstatement, promotion, or front pay, arguing that Jean-Baptiste lacks the qualifications to hold a lifeguard position.   Def.'s Opp'n to Pl.'s Mot. Equitable Relief 4, ECF No. 211 (citing *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 773 n.31 (1976)).[1] Moreover, the District argues that promotion would be unduly speculative, suggesting that plaintiff is unlike former Aquatics Director Sean Link who "ultimately served a supervisor at the end of his eighteen year period with DPR."   Def.'s Opp'n 5.   Finally, because the District avers

---

[1] The District attempts to submit two documents as Exhibit 2 to its Opposition.   The first is a letter prepared by David Brooks reporting that Jean-Baptiste failed a recent water skills evaluation and two versions of a written exam entitled "CPR/AED for the Professional Rescuer and First Aid."   The second document contains Jean-Baptiste's responses to that written exam.   Jean-Baptiste moves to strike the exhibit, arguing that it is an unsworn statement and that the defendant has not identified the qualifications of the person who prepared the document.   *Mot. Strike, ECF No. 216; Mot. Strike, ECF No. 223.*   The District argues that the evidentiary standards cited by Jean-Baptiste do not apply to a motion for equitable relief and also submits an affidavit from Mr. Brooks to address the District's concerns.   *See* Def.'s Opp'n to Pl.'s Mot. Strike Def.'s Ex. Two 2, ECF No. 218.   The affidavit of Mr. Brooks states that he is employed by DPR as a Recruitment and Lifeguard Trainer and that Jean-Baptiste attended a four-day, thirty two hour course he gave in April 2013.   Jean-Baptiste urges the Court not to consider "this late-submitted evidence."   Pl.'s Mot. Strike Lodged Sealed Document 2, ECF No. 223.   Jean-Baptiste also argues that the affidavit fails to state that "everything in the original letter is true or correct."   *Id.* at 3.   The Court need not resolve this dispute and will deny the motions to strike as moot because, as explained in more detail below, the Court finds the exhibits irrelevant to its decision.

that plaintiff lacks the qualifications to hold the lower ranked position of lifeguard, the District argues that Jean-Baptiste should not be promoted to any higher position.

The District also opposes any award of front pay, suggesting that this is only appropriate where reinstatement is not feasible.  *Id.* at 5.  The District cites *McKennon v. Nashville Banner Publishing Company*, 513 U.S. 352 (1995), for the proposition that neither reinstatement nor front pay are appropriate where the employer has alternative, lawful grounds for terminating the employee.  *Id.* at 5–6.  Again, because the plaintiff is allegedly unqualified to work as a lifeguard, the District seeks to avoid a front pay award.

### *1.     Legal Standard*

In employment discrimination cases, "[r]einstatement is the presumptive remedy to make a successful plaintiff whole, though courts have recognized that there are exceptional circumstances sufficient to rebut the presumption."  *Glymph v. Dist. of Columbia*, 374 F. Supp. 2d 219, 226 (D.D.C. 2005) (citing Robert Belton, Remedies in Employment Discrimination Law, § 7.16 at 236 (1992)); *see also Squires v. Bonser*, 54 F.3d 168, 173 (3d Cir.1995) ("[R]einstatement is the preferred remedy in the absence of special circumstances militating against it.").  "Title VII envisioned that making a victim whole would include his reinstatement to the position he would have held but for the discrimination.  Section 706(g), 42 U.S.C. § 2000e-5(g), the remedial provision of Title VII, specifically includes reinstatement as an appropriate judicial remedy."  *Lander v. Lujan*, 888 F.2d 153, 156 (D.C. Cir. 1989).  However, even where reinstatement to plaintiff's original role is not feasible for some reason, the employer may have a responsibility to find comparable work for the plaintiff.  *Glymph,* 374 F. Supp. 2d at 226.

Alternatively, courts have ordered front pay as a substitute for reinstatement where reinstatement is not a viable option. *Pollard v. E.I. duPont de Nemours & Co.*, 532 U.S. 843 (2001); *see also Barbour*, 48 F.3d at 1279 ("The presumption that back pay will extend through the date of judgment derives from the related presumption that the employer will then rectify the discrimination by hiring or reinstating the employee. When that preferred remedy is unavailable, front pay is appropriate." (internal citations omitted)).

### 2.    *Analysis*

The Court will order that, within thirty days of today's date, Jean-Baptiste be reinstated into a year-round lifeguard position, *contingent upon* her demonstrating that she satisfies the qualifications and requirements for such a position. This may include a requirement, if imposed on other employees, that Jean-Baptiste pass tests related to her skills in CPR, AED, and first aid. The District may not impose unreasonable requirements on Jean-Baptiste or mandate that she meet a higher standard than that required for similarly situated employees or applicants.

If Jean-Baptiste cannot show that she is qualified for the position of lifeguard, the District must offer her, within forty five days of today's date, a position "comparable to the position she held and for which she is qualified." *Glymph*, 374 F. Supp. 2d at 227. Such a position must offer pay and benefits at least as generous as those provided to year-round lifeguards.

The Court will retain jurisdiction to resolve any disputes between the parties as to the comparability of the offered position, plaintiff's qualifications for the position, plaintiff's decision not to accept the offered position, etc. *See id.* at 228.

The Court will not order that Jean-Baptiste be reinstated to a higher level position than the one she occupied prior to her termination. The Court finds unduly speculative Jean-Baptiste's arguments that she would have been promoted to a facility management position in the

time between her termination and the present.  Plaintiff offers Sean Link as a comparator, but the District avers that Link "started working seasonally as a lifeguard and progressed over the years from an instructor, and then became a pool manager, site director, and ultimately served as a supervisor at the end of his eighteen year period with DPR."  Def.'s Opp'n 5.[2]  Plaintiff counters this argument by asserting that Link "advanced from the position of Recreation Specialist to the Aquatic Director of DPR in just four years."   However, without more information about the duties of a recreation specialist and the typical advancement of DPR employees, the Court cannot base a decision to promote Jean-Baptiste on such vague assertions.

Because the Court orders prompt reinstatement to a lifeguard or comparable position, the Court will not order front pay.

## B.      Back Pay

Jean-Baptiste seeks back pay from the date of her termination to the date of final judgment, plus pre-judgment interest.  In calculating the back pay due, Jean-Baptiste uses her salary at the time of her discharge in 2006 ($13.50/hour) multiplied by forty hours per week. Pl.'s Mem. 7.  She adds interest compounded daily at the "short-term federal rate" and makes deductions for interim earnings.  *Id.*  Without citation, Jean-Baptiste argues that, in pay periods where her earnings exceeded her back pay, the Court should set the back pay amount at zero rather than allowing the excess earnings to count against her back pay award in other pay periods.  *Id.* at 8.  Based on these calculations, Jean-Baptiste seeks $119,157.50 in back pay as of

---

[2] Mr. Link testified that he had begun working as a lifeguard in Maryland beginning in or around 1991.  Trial Tr. 58–60, Aug. 8, 2012.  He began working as a lifeguard for DPR in or around 1994.  *Id.*  He stated that, after joining DPR, he worked as a lifeguard and instructor, and progressed to become site director and supervisor.  *Id.*  At some point over the twelve year period between 1994 and 2006, he became an "acting pool manager" or "rec specialist." *Id.* at 89.  In April 2010, he became the Aquatics Director.  Thus, it appears that as many as fifteen years elapsed between the time he began lifeguarding and when he became an acting pool manager.

September 4, 2012 and asks that the amount be increased to reflect interest and back pay up to today's date.

The District opposes any award of back pay, arguing that Jean-Baptiste was "no longer qualified for the lifeguard position" when she was discharged and that "the jury's award was therefore sufficient 'make whole' relief."   Def.'s Opp'n 2.   The District argues that the jury determined only that retaliation was a "motivating factor" in Jean-Baptiste's discharge, thus leaving open the possibility that plaintiff would no longer have been employed as a lifeguard even absent retaliatory action.  *Id.* at 2–3.

Alternatively, should the Court award back pay, the District disputes the method Jean-Baptiste used to calculate the amount.  *Id.* at 3.  The District argues that back pay should not be calculated to the date of final judgment, though it does not explain the basis for this argument. The District also asserts that interest on back pay should be compounded annually rather than daily, arguing that the Eleventh Circuit approach relied on by Jean-Baptiste is not universally accepted.  *Id.*

### 1.    *Legal Standard*

#### a.    Availability of back pay generally

Both Title VII and the DCHRA allow for reinstatement with or without back pay.  The WPA also provides for back pay and explicitly states that interest on back pay shall be available.

Although back pay "is not an automatic or mandatory remedy; . . . it is one which the courts may invoke in the exercise of their sound 'discretion [which] is equitable in nature."  *Ford Motor Co. v. EEOC*, 458 U.S. 219, 226 (1982) (internal quotation marks and citation omitted). Courts must exercise the power to grant back pay "'in light of the large objectives of" Title VII. *Id.* (internal citation omitted).  These objectives include ending employment discrimination and

encouraging Title VII defendants to "promptly . . . make curative, unconditional job offers to Title VII claimants, thereby bringing defendants into 'voluntary compliance' and ending discrimination far more quickly than could litigation proceeding at its often ponderous pace." *Id.* Moreover, Title VII attempts to "make the victims of unlawful discrimination whole by restoring them, so far as possible to a position where they would have been were it not for the unlawful discrimination." *Id.* at 230 (internal quotation marks omitted).[3]

Although back pay is thus often available, "[i]nterim earnings or amounts earnable with reasonable diligence by the [plaintiff] shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). Thus, Title VII subjects claimants to a "statutory duty to minimize damages," *Ford Motor*, 458 U.S. at 231, and claimants must "use reasonable diligence in finding other suitable employment," *id.* at 231. Where a plaintiff could have found work but failed to do so, some courts have denied all back pay. *See, e.g.*, *Hopkins v. Price Waterhouse*, 920 F.2d 967, 981–82 (D.C. Cir. 1990). Nevertheless, the employer has the burden of proving inadequate mitigation. *Hopkins v. Price Waterhouse*, 737 F. Supp. 1202, 1212 (D.D.C. 1990) *aff'd*, 920 F.2d 967 (D.C. Cir. 1990); *see also Neal v. Dir., Dist. of Columbia Dep't of Corr.*, Civ. No. 93-2420, 1995 WL 517249 (D.D.C. Aug. 9, 1995) ("Defendants have the burden of going forward with evidence to establish the amount of earnings to be deducted, and to establish that plaintiffs failed to exercise reasonable diligence, if applicable.").

As explained in more detail below, the amount of the "set off" for interim earnings may sometimes be difficult to calculate.

> b.     Appropriate time period for back pay

---

[3] Courts sometimes deny back pay on the basis of equitable considerations, however, this appears to be in limited circumstances. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975) ("[B]ackpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.").

The Court will award back pay to Jean-Baptiste from the date of her termination until the date of today's judgment.  *See Fogg v. Gonzales*, 492 F.3d 447, 454 (D.C. Cir. 2007) (affirming a district court's grant of back pay to the date of judgment and citing cases approving similar awards); *see also Barbour*, 48 F.3d 1270, 1279 (D.C. Cir. 1995) ("The presumption that back pay will extend through the date of judgment derives from the related presumption that the employer will then rectify the discrimination by hiring or reinstating the employee.").[4]

Although back pay will often extend to the date of judgment, it may be cut short if a plaintiff fails to properly mitigate damages.  Because Title VII plaintiffs must use "reasonable diligence to maintain any suitable employment which is secured," *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269 (4th Cir. 1985), a plaintiff who obtains employment prior to judgment but who is terminated after failure to make "reasonable and good faith efforts to maintain that job" may not receive back pay after discharge from the employment obtained.  *Id.* at 1277; *but see Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 382 (1st Cir. 2004) ("[B]ack pay is not permanently terminated when an employee is fired for misconduct or voluntarily quits interim employment.").  Again, however, failure to adequately mitigate is an affirmative defense which must be raised by the employer.  *Cf. Barbour*, 48 F.3d at 1279–80 ("The defendant remains free to challenge the award's amount, length, or interest rate, or to establish as an affirmative defense that the plaintiff failed to mitigate damages.").

From 2009 to June 2010, Jean-Baptiste had employment that paid substantially better than the job from which she was terminated with DPR.  The Court has no information regarding why this employment ended in June 2010.  The District has not suggested that it was through any

---

[4] In the National Labor Relations Act (NLRA) context, "backpay" was often awarded until the date of reinstatement, even if that occurred after judgment.  *Pollard*, 532 U.S. at 849.  The Title VII provision authorizing back pay closely tracked a similar provision in the NLRA.  However, in the Title VII context, "'backpay' occurring after the date of judgment is known today as 'front pay.'"  *Id.*

fault of Jean-Baptiste's, and thus, the Court cannot find that back pay should end prior to judgment.

Given that back pay will extend from the date of Jean-Baptiste's termination to today's date, the *maximum* possible back pay award is $189,540. This represents the plaintiff's prior compensation rate of $13.50 per hour, assuming forty hours per week of work, from the pay period ending November 3, 2006, until today. Because the Court will reduce this figure to account for interim earnings and will allow prejudgment interest, this is not the final back pay award for Jean-Baptiste.

c. Interim earnings set off calculation

Where there is a short time period between the termination of a plaintiff and final judgment, or where interim earnings never exceed projected back pay, calculation of back pay is relatively straightforward. For example, some judges in our Circuit appear to have simply calculated the total estimated back pay award and deducted total interim earnings from that amount. *See, e.g.*, *Chadwick v. Dist. of Columbia*, 56 F. Supp. 2d 69, 73 (D.D.C. 1999) ("The period between plaintiff's constructive discharge and the verdict was two years and 92 days. . . . [P]laintiff would have earned $66,980.61 over that period. After subtracting the $3000 plaintiff earned in the interim as mitigated damages, the Court concludes that plaintiff should be awarded $63,980.61 in back pay, plus prejudgment interest."). Other judges appear to have assessed back pay awards on an annual basis and have subtracted annual interim earnings from annual total back pay to arrive at a final award. *See Hopkins*, 737 F. Supp. at 1215 ("[Plaintiff's] back pay award for each fiscal year shall be determined by subtracting from the average Price Waterhouse

partnership salary for her class as stipulated, $100,000, or her actual earnings, whichever is greater.").[5]

Calculation of back pay is more complicated when a plaintiff has interim earnings which sometimes exceed estimated back pay. The Sixth Circuit has denied all back pay compensation when a plaintiff's interim earnings exceeded her estimated back pay. *EEOC v. New York Times Broad. Serv., Inc.*, 542 F.2d 356, 359 (6th Cir. 1976) (noting that plaintiff "clearly was not damaged monetarily" where she later earned more than she would have in the position she sought). The Eighth Circuit utilized an annual back pay calculation, such that if, in any given year, the plaintiff's earnings exceed her back pay award, the excess would not reduce the back pay owed in any other year. *Leftwich v. Harris-Stowe State Coll.*, 702 F.2d 686, 693 (8th Cir. 1983) ("Under a year-by-year approach, when, as here, a plaintiff's interim earnings in any year exceed the wages he or she lost due to the discrimination, that 'excess' must not be deducted from any back pay for other years to which the plaintiff is entitled."); *see also id.* (noting that Fifth and Tenth Circuits had affirmed district court cases using a similar approach). On the other hand, the Eleventh Circuit has taken a slightly different approach, following the practice in NLRA cases to calculate back pay on a quarterly basis.[6]  *See Darnell v. City of Jasper, Ala.*, 730

---

[5] The court in *Hopkins* also held that back pay may be reduced by the amount the claimant "could have" earned "with reasonable effort." 737 F. Supp. at 1215. Because this is part of the affirmative defense of failure to mitigate, and because the District has presented no argument or evidence on this point, the Court will not consider whether any theoretical earnings should reduce her back pay award.

[6] The D.C. Circuit has described the evolution of back pay calculations in the NLRA context:

> Before 1950, the Board calculated backpay by subtracting what an employee actually earned during the entire backpay period from what she would have earned during that period had the unlawful action not occurred. The Board came to realize, however, that computing backpay in that manner encouraged employers to delay reinstating wrongfully terminated employees: if the employer waited long enough, the employee could start earning more at her new job than she would have earned at her old job, decreasing the employer's total backpay liability. To eliminate this perverse incentive, the Board announced a new approach in *F.W. Woolworth*, 90 N.L.R.B. 289 (1950), under which it subtracted what an employee actually made from what she would have made on a quarterly basis, with the condition that "[e]arnings in one particular quarter ... ha[d] no effect upon the back-pay liability for any other quarter." Thanks to the *Woolworth* approach, an

F.2d 653 (11th Cir. 1984).  Under this approach, earnings exceeding back pay in any quarter will not reduce the pay owed in any other quarter.[7]

The Court will use the annual method of calculating back pay endorsed by the Eighth Circuit and, apparently, at least one other court in our Circuit.[8]  Thus, where Jean-Baptiste earned more in a given year than her estimated back pay, the excess will not reduce her award in any other year.

| Year | Estimated Back Pay | Interim Earnings | Estimated Back Pay Less Interim Earnings[9] |
|---|---|---|---|
| 2006 | $5,400 | $600 | $4,800 |
| 2007 | $28,080 | $9,826 | $18,254 |
| 2008 | $27,000 | $11,964 | $15,036 |
| 2009 | $28,080 | $43,000 | 0 |
| 2010 | $29,160 | $22,360 | $6,800 |
| 2011 | $28,080 | $0 | $28,080 |
| 2012 | $28,080 | $0 | $28,080 |
| 2013 | $15,660 | $0 | $15,660 |
| TOTAL | $189,000 | $87,750 | **$116,170** |

d.      Prejudgment interest

---

employer no longer benefitted if a wrongfully terminated employee eventually started making more money at her new job than she would have made at her old job—those additional earnings did not offset what the employer owed in backpay for any previous quarters.

*Deming Hosp. Corp. v. NLRB*, 665 F.3d 196, 199–200 (D.C. Cir. 2011) (internal citations omitted).  The D.C. Circuit does not appear to have applied such an approach in the Title VII context.

[7] The Court is unaware of any court applying the method suggested by Jean-Baptiste, namely calculating back pay on a pay period basis, such that excess interim awards in any pay period do not affect the award of any other pay period.  Again, Jean-Baptiste has provided no citation to support the use of this method.

[8] Some courts have declined to follow this approach on the theory that it departs from the "make whole" principle of Title VII and thus may result in a windfall to plaintiffs.  *See, e.g., Sinclair v. Ins. Co. of N. Am.*, 609 F. Supp. 397, 402 n.3 (E.D. Pa. 1984) *aff'd sub nom. Appeal of INA Corp.*, 782 F.2d 1029 (3d Cir. 1986) *and aff'd sub nom. Appeal of Sinclair*, 782 F.2d 1031 (3d Cir. 1986) *and aff'd sub nom. Sinclair v. Cigna Corp.*, 782 F.2d 1031 (3d Cir. 1986) ("The *Leftwich* rule may assure that employers do not benefit from employee's 'excess' earnings.  However, in my opinion, it has an overriding disadvantage of discouraging mitigation.").  While equitable concerns may sometimes counsel against the use of such an approach, the Court does not believe they do so here.  Here, defendant has not even raised the possibility that Jean-Baptiste failed to mitigate her damages.  If the defendant were to raise these concerns, the Court could deny or reduce back pay on the grounds that Jean-Baptiste had failed to sufficiently mitigate her damages.

[9] This number is set to zero if interim earnings exceeded estimated back pay in any given year.

13

Title VII authorizes prejudgment interest as part of the back pay remedy in suits against private employers. *Loeffler v. Frank*, 486 U.S. 549, 557 (1988). Indeed, prejudgment interest is presumptively available. *Cf. Barbour*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) (noting, in the context of a claim under 42 U.S.C. § 1981 that "in view of [plaintiff's] entitlement to make-whole relief and the general remedial principle that '[p]rejudgment interest is an element of complete compensation,' we agree . . . that prejudgment interest 'must be an ordinary part of any award of back pay.'" (internal citations omitted)). How to compute prejudgment interest is within the discretion of the district court. *Berger v. Iron Workers Reinforced Rodmen, Local 201*, 170 F.3d 1111, 1139 (D.C. Cir. 1999); *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450 (D.C. Cir. 1996) (noting that the use of the prime rate is "well within the district court's discretion").[10]

The D.C. Circuit has held that prejudgment interest is available against state governments in addition to private employers. *Jones v. Washington Metro. Area Transit Auth.*, 205 F.3d 428, 434 (D.C. Cir. 2000) (affirming award of prejudgment interest and noting that the circuit saw "no bar to awarding pre-judgment interest on back pay assessed against a state under Title VII, as to which the Congress expressly and effectively abrogated Eleventh Amendment immunity, and which has long been recognized, in the absence of immunity, to authorize prejudgment interest

---

[10] In a citation, Judge Facciola summarized the approach taken by the judges of this Court in determining the appropriate prejudgment interest:

> *See Chadwick v. District of Columbia*, 56 F. Supp. 2d 69, 73 n. 2 (D.D.C.1999) ("Unless the parties agree otherwise, prejudgment interest should be awarded at the prime rate for each year between plaintiff's constructive discharge and the entry of judgment"); *Jefferson v. Milvets System Technology*, 986 F. Supp. 6, 9 (D.D.C.1997) ("Neither the plaintiff nor the defendant has suggested a methodology whereby the Court is to calculate pre-judgment interest. Therefore the Court holds that pre-judgment interest shall be calculated in accordance with 28 U.S.C. § 1961, which governs post-judgment interest"); *Hartman v. Duffey*, 8 F.Supp.2d 1, 3 (D.D.C.1998) ( "there is no unjust enrichment to the government in selecting the one-year Treasury Bill Rate as the rate of pre-judgment interest ... That rate was the pre-*Forman* recommendation of the experts and has been, over time, about one-half percent greater then the three month T Bill rate urged by the government.").

*Griffin v. Washington Convention Ctr.*, 2000 WL 1174967 (D.D.C. July 21, 2000).

as part of its back pay remedy" (internal citations omitted)).  Moreover, the District of Columbia has explicitly authorized interest on back pay awards under the WPA.  D.C. Code § 1-615.54(a)(1)(E).

There is some authority to suggest that interest on Title VII back pay awards against the District of Columbia is capped at four percent per year.  *See King v. Palmer*, 641 F. Supp. 186, 188 (D.D.C. 1986) (stating that interest on back pay is authorized by Title VII but that "the rate of interest on a Title VII judgment against the District of Columbia or its officials is fixed at 4 percent by D.C. Code § 28–3302").  Assuming that this rule applies to interest on back pay and that it is not limited to postjudgment interest, this cap would appear to apply to back pay awarded under the DCHRA and WPA as well.  In this case, the jury verdict did not distinguish between liability based on violations of Title VII and that based on violations of the DCHRA and WPA.  Thus, the Court will assume that D.C. Code § 28-3302 limits the interest that may be imposed on the back pay awarded under any of the three statutes and the Court will use four percent as the applicable interest rate.

The interest rates relied upon by plaintiff ranged from three to nine percent.  Thus, four percent interest for the entire time period is not a significant departure from that claimed by plaintiffs.[11]  Moreover, the District appears to have conceded that interest rates as high as six percent might be a reasonable interest rate.  Def.'s Opp'n 3 (citing with approval *Berger v. Iron Workers Reinforced Rodmen, Local 201*, 170 F.3d 1111, 1139 (D.C. Cir. 1999), in which the Circuit affirmed the use of six percent interest compounded annually).  Finally, a four percent

---

[11] If the Court were to use the interest rates supplied by plaintiff, compounded annually, the total interest awarded would be $16511.15, nearly the same as the amount arrived at using a four percent rate across all years.

annual rate over the relevant time period is consistent with the prime rate, which has been endorsed by other courts in our Circuit.[12]

In short, the Court will use an interest rate of four percent compounded annually and will award Jean-Baptiste $133,283 in backpay and prejudgment interest thereon.

| Year | Estimated Back Pay Minus Interim Earnings[13] | Estimated Back Pay Minus Interim Earnings Plus Prior Year's Total | Annual Interest | Total Amount Due |
|---|---|---|---|---|
| 2006 | $4,800 | N/A | $60.49 | $4,860.49 |
| 2007 | $18,254 | $23,114.49 | $924.58 | $24,039.07 |
| 2008 | $15,036 | $39,075.08 | $1,563 | $40,638.08 |
| 2009 | 0 | $40,638.08 | $1,625.52 | $42,263.60 |
| 2010 | $6,800 | $49,063.60 | $1,962.54 | $51,026.14 |
| 2011 | $28,080 | $79,106.14 | $3,164.25 | $82,270.39 |
| 2012 | $28,080 | $110,350.39 | $4,414.01 | $114,764.40 |
| 2013 | $15,660 | $130,424.40 | $2,858.62 | $133,283 |
| TOTAL | $116,710 | N/A | $16,573.02 | $133,283 |

## C.    Permanent Injunction

Jean-Baptiste requests a permanent injunction enjoining the District from further discrimination and retaliation against her.  Pl.'s Mem. 10.  Jean-Baptiste argues that such a remedy is "typical" in this jurisdiction.  *Id.* (citing *Bass v. Tanoue*, 2001 WL 1659158, at *7 (D.D.C. Dec. 21, 2001); *Jones*, 205 F.3d at 435 (D.C. Cir. 2000)).

The District acknowledges that "injunctions are a typical remedy under Title VII when additional discrimination is anticipated," Def.'s Opp'n 6 (citing *Mitchell v. Sec'y of Commerce*, 715 F. Supp. 409, 410 (D.D.C. 1989)).  However, the District argues that a permanent injunction is unnecessary here because there is "no reasonable expectation that future discriminatory acts

---

[12] The prime rates were 7.96% in 2006, 8.05% in 2007, 5.09% in 2008, and 3.25% in 2009 through 2012. Calculating interest at these rates, and assuming a 3.25% rate for 2013 (which is consistent with current monthly prime rates) would result in an award of $15,539.74 in interest, or a difference of just over $1033.

[13] This number is set to zero if interim earnings exceeded estimated back pay in any given year.

are likely to occur." *Id.* (citing *Bundy v. Jackson*, 641 F.2d 934, 953 n.13 (D.C. Cir. 1981)).  The District also states that DPR no longer employs Jean-Baptiste's "alleged" harasser, Rodney Weaver, or any of the management staff who were at DPR during the relevant time period.[14]

### 1.    *Legal Standard*

Title VII provides that if the "court finds that the respondent has intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice . . . ." 42 U.S.C.A. § 2000e-5.[15]

A request for an injunction "will be moot only where there is no reasonable expectation that the conduct will recur, or where interim events have 'completely and irrevocably eradicated the effects of the alleged violation.'"  *Bundy*, 641 F.2d at 946 n.13 (citing *United States v. W. T. Grant Co.*, 345 U.S. 629 (1953), *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  In *Bundy*, the D.C. Circuit held that there was no certainty that the unlawful conduct would recur

---

[14] The Court notes that, at least in the eyes of our jury system, Mr. Weaver is no longer the "alleged" harasser.  The jury found that it was "more likely than not that Rodney Weaver subjected the plaintiff to unwelcome verbal or physical conduct" and that this "conduct was sufficiently severe or pervasive such that it created a hostile work environment . . . ."  Verdict Form 1, ECF No. 185.

[15] In the context of permanent injunctions generally, a four-factor test normally governs whether a permanent injunction may issue.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The test requires that plaintiff show the following:

> (1) that [she] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.*

> However, courts in our circuit do not appear to have explicitly applied this four-factor test in the Title VII context.  There is some authority that it should be applied.  For example, *eBay* held that the test "appl[ies] with equal force to disputes" under the Patent Act, which "expressly provides that injunctions 'may' issue 'in accordance with the principles of equity'").  *Id.* at 391–92.  Additionally, the District of Maine applied the four-factor test in the context of Title VII in *EEOC v. DCP Medstream, L.P.*, 608 F. Supp. 2d 107, 109 (D. Me. 2009).  However, in *DCP Medstream*, the court held that the first three prongs of the four-factor test were met because the jury found an unlawful employment practice and because Title VII explicitly endorses equitable relief.  The fourth prong was "likewise met because . . . 'the public has an interest in the enforcement of federal statutes.'"  *Id.* (internal citations omitted)).  Thus, under *DCP Medstream*'s analysis, the four-factor test would appear to be satisfied in any Title VII case in which a verdict is rendered for the plaintiff.  Given the general practice in our Circuit of granting Title VII injunctions without an explicit invocation of this test, the Court finds it unnecessary to engage in the four-factor analysis.  Nevertheless, the Court will address the factors briefly below.

because the employer had "taken no affirmative steps to prevent recurrence of the harassment, and because all the harassing employees still work for the agency." *Id.*  The Court noted that an Order issued by the Mayor did "not provide any certainty that the offending conduct [would] not recur," *id.*, despite the fact that Order made clear that sexual harassment constituted sex discrimination and required the D.C. Office of Human Rights to "receive and adjudicate any complaints of sexual harassment . . . and require[d] all agency heads to establish and implement intra-agency means of investigating and adjudicating complaints of harassment."  *Id.* at 947 & n.14.

Thus, an injunction may be issued even if an employer alters its conduct after discrimination charge.  *See, e.g., EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987) ("Generally, a person subjected to employment discrimination is entitled to an injunction against future discrimination unless the employer proves it is unlikely to repeat the practice. . . .  An employer that takes curative actions only after it has been sued fails to provide sufficient assurances that it will not repeat the violation to justify denying an injunction."); *Spencer v. Gen. Elec. Co.*, 894 F.2d 651, 660 (4th Cir. 1990) *abrogated on other grounds by Farrar v. Hobby*, 506 U.S. 103 (1992) ("While it is true that this policy was instituted at least partially in response to this litigation, the trial court found that the policy reflects a bona fide committed effort by G.E. to combat sexual harassment in the workplace.").

If granted, injunctions should be narrowly tailored and should generally apply only to the plaintiff where a class has not been certified.  *See Jones v. Wash. Metro. Area Transit Auth.*, 946 F. Supp. 1023, 1034 (D.D.C. 1996) *aff'd in part, vacated in part on other grounds*, 205 F.3d 428 (D.C. Cir. 2000) (noting that, where jury was not asked to find retaliation against other employees, nor did plaintiff rely on statistical evidence of disparate impact, injunctive relief had

to be limited to prohibiting the employer from retaliating against plaintiff); *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 361 (1st Cir. 1989) ("An injunction should be narrowly tailored to give only the relief to which plaintiffs are entitled . . . ."); *id.* (warning against an injunction that is effectively class-wide where no class has been certified).

### 2.  *Analysis*

The Court will grant Jean-Baptiste's request for a permanent injunction enjoining the District from further discrimination and retaliation.

The evidence presented at trial suggested pervasive harassment and discrimination within DPR and inadequate policies and procedures to respond to such conduct. Specifically, the jury heard testimony of a "culture of sexual harassment and sexual discrimination" at the pool where Jean-Baptiste worked, of a "boys-gone-wild culture" in the aquatics department, and, with respect to many of the male supervisors above Jean-Baptiste, "a boys club from the top down." Test. of Stacy Mills, Trial Tr. 42–48, Aug. 7, 2012. Jean-Baptiste testified that she complained about the Weaver's harassment of her to at least six supervisors and that none responded adequately. Two other individuals complained, again in vain, on Jean-Baptiste's behalf.

Additionally, the harassment of Jean-Baptiste does not appear to have been an isolated incident by one supervisor against one victim. *Cf. Spencer*, 894 F.2d at 660 (affirming district court's denial of permanent injunction where the case presented "an isolated incident of one supervisor run amok"). Jean-Baptiste's harasser had been accused of sexual harassment one year before Jean-Baptiste was hired and supervisor Margarita Cruz testified that, in response, she exaggerated complaints about that victim's work performance to protect the harasser. Trial Tr. 58–73, Aug. 7, 2012; Trial Tr. 31–35, 53, Aug. 8, 2012. Cruz also testified that she herself had been sexually harassed by another of Jean-Baptiste's supervisors. Moreover, the jury held that

Jean-Baptiste's complaints about her harassment played "substantial or motivating factor" in the District's decision to terminate her or to not offer her permanent employment.

The District states that neither the "alleged" harasser, Rodney Weaver, nor any of the management employees employed during the relevant time period is still with DPR.  The District also states that "the instant litigation involved a review of all of the employees and managers working at the Takoma Pool during the relevant time period by both the Attorney General's office and the DPR General Counsel."  However, the latter statement is so vague as to be almost meaningless.  All litigation, given the discovery process, necessarily involves a "review" of the individuals involved.  Moreover, nowhere does the District state that it took proactive steps to discipline or dismiss the employees involved in this matter.  It may be the case that these employees, over the course of the last six to seven years, have simply obtained other employment of their own accord.  Moreover, the District admits that it did not revise its EEO policy until after the jury's verdict in this case.  *See* Def.'s Opp'n at 7 (citing a policy revision dated September 26, 2012).  Such a last minute effort is hardly evidence that the District's conduct is unlikely to recur.  *Cf. Spencer*, 894 F.2d at 660 (affirming district court's denial of permanent injunction where, in response to isolate incident, the employer had "gotten rid of the offending supervisor, transferred plaintiff to a job of equal grade, and instituted an extensive company-wide anti-sexual harassment policy").

In short, the Court has significant concerns that the District could once again fail to respond to harassment of or discrimination against Jean-Baptiste, or that it could allow improper retaliatory motives to play a role in personnel decisions related to Jean-Baptiste.  Monetary damages do not entirely compensate for plaintiff's injuries given that plaintiff remains unemployed and that, upon her reinstatement, she is at risk of being subjected to additional

harassment and retaliation.   Moreover, the balance of hardships certainly favors the relief requested.   A permanent injunction barring discrimination against plaintiff imposes little burden on the District.   In fact, such an injunction does not prevent the District from acting *lawfully* as an employer.   Thus, if Jean-Baptiste fails to fulfill her duties as an employee or if she engages in misconduct, the district may respond.   *Cf. Lander*, 888 F.2d at 158 ("To be sure, Lander's right to reinstatement to the top administrative job in the Bureau does not mean he has life tenure in the job.   He has only the right not to be transferred or disadvantaged for discriminatory reasons. . . . [H]e could be transferred sometime in the future for a nondiscriminatory reason . . . .")   On the other hand, the injunction provides significant benefit to Jean-Baptiste and protects her from any future unlawful actions by the District.   Finally, the public interests in remedying and preventing discrimination and retaliation clearly weigh in favor of granting the injunction.

The Court will grant a narrowly tailored injunction enjoining the District from discriminating against Jean-Baptiste on the basis of her sex and from retaliating against Jean-Baptiste on the basis of her engagement in protected activities.

### D.      Jury Recommendations

In rendering its verdict, the jury made policy recommendations to the District. Specifically, it recommended that the District begin EEO training for all DPR managers, rewrite personnel policies to remove ambiguities, and review the actions, or lack thereof, taken by DPR employees and managers at the Takoma Pool and Aquatic Program during and immediately following Jean-Baptiste's employment.   Verdict Form at 4, ECF No. 185.

Jean-Baptiste asks the Court to order the District to take the steps suggested by the jury. Pl.'s Mem. 11–12.   She asks that the District be required to update the Court and her counsel every six months for the next three years regarding the status of the actions taken and that DPR

"hire or appoint someone with an expertise in effective EEO policies and procedures to oversee this overhaul of its EEO policies and procedures." *Id.*

The District responds that such an order is unnecessary because the jury's recommendations have already been implemented.  Specifically, it states that: "DPR revised its sexual harassment and EEO policy following the jury's verdict . . . ," Def.'s Opp'n 7 (citing Ex. 3, EEO policy dated Sept. 26, 2012); that "all DPR employees, including managerial employees, undergo sexual harassment training on an annual basis," *id.*; and that "the instant litigation involved a review of all of the employees and managers working at the Takoma Pool during the relevant time period by both the Attorney General's office and the DPR General Counsel.  None of the managers at the Takoma Pool during the relevant time period are any longer with the DPR or the District." *Id.*

### 1.    *Legal Standard*

Title VII provides that if the court "finds that the respondent has intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may . . . order such affirmative action as may be appropriate.  42 U.S.C.A. § 2000e-5(g)(1).  However, as with other injunctive relief, orders requiring affirmative action should be narrowly tailored.  *See supra*. Moreover, such orders should generally apply only to the plaintiff where a class has not been certified.  *See supra*.

### 2.    *Analysis*

The Court agrees with the jury that this case revealed serious structural and policy concerns regarding how the District responds to complaints of harassment.  Nevertheless, the jury's recommendations were exactly that:  recommendations.

This case was not a class action.  Although the Court heard testimony regarding that "culture" of harassment at DPR, the jury did not have to determine whether a class-wide problem existed.

The Court does not find it necessary or appropriate to issue what would essentially be an order for affirmative action intended to benefit a class of employees.  The Court will decline to order such action.

## IV.    CONCLUSION

The Court grants in part and denies in part Jean-Baptiste's motion for equitable relief. The Court will grant Jean-Baptiste's request for reinstatement and order that, within thirty days of today's date, Jean-Baptiste be reinstated into a year-round lifeguard position, *contingent upon* her demonstrating that she satisfies the qualifications and requirements for such a position.  If Jean-Baptiste cannot show that she is qualified for the position, the District must offer her, within forty five days of today's date, a position comparable in pay and benefits.  The Court will retain jurisdiction to resolve any disputes between the parties regarding this aspect of the order. Along with reinstatement, the Court will award back pay plus prejudgment interest in the total amount of $133,283.02.

The Court will also enjoin the District from discriminating against Jean-Baptiste on the basis of her sex and from retaliating against Jean-Baptiste on the basis of her engagement in protected activities.  Although the Court shares the concerns raised by the jury, the Court will not order the District to take the affirmative steps recommended by the jury.

A separate Order consistent with this Memorandum Opinion and a final judgment in this case shall issue this date.

Signed by Royce C. Lamberth, United States District Court Judge, on July 19, 2013.